[No. D005053. Fourth Dist., Div. One. Dec. 8, 1987.]

Conservatorship of the Person of JOHN THOMAS WALKER.
SAN DIEGO COUNTY DEPARTMENT OF SOCIAL SERVICES,
Petitioner and Respondent, v.
JOHN THOMAS WALKER, Objector and Appellant.

COUNSEL

Mark Licker, under appointment by the Court of Appeal, for Objector and Appellant.

Lloyd M. Harmon, Jr., County Counsel, and Mark C. Mead, Deputy County Counsel, for Petitioner and Respondent.

OPINION

**WORK, J.**—John Thomas Walker (John) appeals a judgment appointing a public conservator for him in response to a petition by the San Diego County Department of Social Services Counselor in Mental Health (County). He contends (1) the court erred in giving or failing to give certain jury instructions resulting in denial of due process and (2) the court abused its discretion in denying a hearing on who was to be appointed conservator.

We hold the court made certain instructional errors, which were harmless beyond a reasonable doubt. We further hold that where proof to establish a conservatorship for a person alleged to be gravely disabled is based upon substantially circumstantial evidence, the proposed conservatee is entitled, on request in an appropriate case, to have the jurors instructed as to the principles relevant when applying circumstantial evidence to the beyond a reasonable doubt burden of proof. However, we hold the court did not err in rejecting such a proposed instruction on the facts of this case, since the circumstantial evidence here is not subject to any inference other than establishing grave disability. We also hold the court abused its discretion in denying a hearing on who was to be conservator.[1] Accordingly, we affirm the order establishing a conservatorship but reverse the order designating the public conservator and remand for further hearing on who the conservator should be.

I

John Thomas Walker is 22 years old and has a mental illness which has been diagnosed as chronic paranoid schizophrenia. John lived with his sister

---

[1] Welfare and Institutions Code section 5361 provides for automatic expiration of a conservatorship after one year. If the conservatorship has expired by the time our decision is rendered, the appeal is nevertheless not moot since it raises issues which are capable of repetition yet avoiding review. (*Conservatorship of Manton* (1985) 39 Cal.3d 645, 647, fn. 1.[217 Cal.Rptr. 253, 703 P.2d 1147]; see our recommendation in *Conservatorship of Forsythe* (1987) 192 Cal.App.3d 1406, 1409 [238 Cal.Rptr. 77] regarding expedited appeals and writs of habeas corpus in conservatorship cases.) Our holding applies to any petitions to reappoint the conservator. (Welf. & Inst. Code, § 5361.)

and brother-in-law in Allied Gardens from June 1984 until October 1985, under an agreement he could live with them only if he took his medication and saw a doctor. He complied, although from time to time he would rebel and say he did not need his medication since it prevented him from getting a job, but then would go back on his medication. About a month before he moved out, he refused to take his medication or go to the doctor. He became more aggressive and threatened to kill them if they forced him to take his medication. He refuses to sign documents, such as the papers to get income from Social Security, and his brother-in-law has to do it for him as his representative.

He lived with his mother in Escondido from October 1985 until January 1986. He refused to take his medication. On one occasion, he was thinking about getting a job, and he began taking medication, but did not take it correctly. His mother told him he needed help, and he told her if she called anyone, he would kill her. He threw things away that belonged to his mother. On two occasions he tried to kick in her locked bedroom door. He attempted to burn her arm with a cigarette, shook his fist an inch from her face, hit her in the face and shoulder, and told the family at Thanksgiving that he would kill them all if he could find a knife. His eating habits were erratic. He regularly stayed away from home all night. Whatever amount of money she gave him, he would spend it within a day or day and a half. She put gas in his car instead of handing him gas money, and he would drive the car until it ran out of gas. In June 1986, he cut the electrical wires to her house with pruning cutters.

John's father lives about a half mile from his mother. John lived with him from January until June 1986. He took no medication during that time. He had a fear of electricity and would unplug everything in the apartment and cut the wires to various appliances. He told his father on one occasion he had been thinking of killing him, and another time he stood in front of the master electrical switch with a steak knife held in a threatening fashion. He threw some of his father's things away. He spent money within 24 hours of receiving it regardless of the amount. One time he left the house at 1 a.m., walked eight or ten miles, and showed up the next morning at a neighbor's house, having thrown away his coat, wallet, keys and watch. Another time he walked 21 miles while barefooted, and called his father and asked if he could take a taxi home because his feet hurt.

At the time of the conservatorship hearing, he was living at a mental health facility in Alpine, where his meals were provided and the taking of his medication supervised. When his parents visited him on weekends he appeared pleasant and happy, carried on a conversation, and was not threatening.

John admits he has a mental problem, and if he were on his own he would not seek treatment for the problem nor take medication. He generally acknowledges his bizarre and threatening conduct described above. He does not like it where he is staying because he has to take medication and they keep him out of bed during the daytime.

His family members and a mental health worker testified about various statements he made about his thoughts; i.e., that he could not breathe without his guitar, he would look at his family members and say he did not know who they were, he was afraid to take a shower because the floor would fall out, what he drank and ate was like blood and parts of a human body, when he plugged something into a socket he was harming someone some distance away, someone is going to kill him, parts of him are being ground up and he has to drink lots of a certain soda to provide the flesh and blood back to his body, the refrigerator talked to him and would harm him, electricity might come from the pain of human beings being ground up, and his medications were poisoning and killing him. At trial, John denied some of these statements and admitted others, and stated electricity still scares him.

A clinical psychologist testified John reported having auditory hallucinations. John's medication does not cure his condition, and must be taken regularly to clear his thoughts and control the hallucinations. If he did not take it, he would lose touch with reality, become more agitated, become threatened by things, and it would be hard for him to react to his immediate environment. The psychologist did not believe he would take his medication voluntarily. He expressed irrational thoughts about taking it; i.e., if he took it in a different city or building it would have a different effect on him. He told the psychologist he would like to get off the medication, but he would take it unless it kills him; and it makes him sick but it was not making him sick in Alpine. The psychologist did not believe he could live on his own because he was likely to go off his medication, and to become too disoriented to provide for himself over time.

A mental health worker testified John told her he did not like taking the medication, but would do so to get out of the mental health facility. Another time he stated he had no problems and would not take the medication.

His sister and mother are no longer willing to have him live with them. His father is not willing to have him live with him unless he were on medication and under the care of a psychiatrist. None of the three think he can live on his own and provide for his basic necessities. His father would help him look for an apartment if he were released from the mental health

facility, but he does not believe he can live on his own and he would cut the wires at an apartment because of his fears.

About three years ago, before he lived with his sister, John lived on his own in an apartment for about three to five months and had a job driving an ice cream truck. According to his mother, it did not work out when he lived on his own since he could not meet his financial obligations or complete a full day's work. John disagreed, claiming he went to live with his sister only to be near the college he planned to attend. The last time he shopped on his own and prepared his own food was when he had his own apartment.

A petition to appoint a conservator claiming John was gravely disabled by reason of a mental disorder as provided by the Lanterman-Petris-Short Act (LPS Act)[2] resulted in a jury unanimously finding John gravely disabled. The court appointed Richard J. Thomson, a public conservator for the Department of Social Services, conservator, imposed specific disabilities, and ordered placement in a closed locked treatment facility. The court refused to hold a hearing on whether a family member or friend should be preferred as a conservator over the public conservator.

## II

■ The jury was instructed as follows:

"The term 'gravely disabled' means a condition in which a person, as a result of a mental disorder, is unable to provide for his or her basic personal needs for food, clothing or shelter.

"If the evidence indicates that a family member, friend or other party has offered and is available to assist John Thomas Walker in providing for food, shelter and clothing—or clothing, you must determine whether that person is responsible and is willing to assist John Thomas Walker.

"Additionally, you must determine if John Thomas Walker is willing and capable of voluntarily accepting treatment.

"*If you find that John Thomas Walker can survive safely in freedom by himself or with the help of this available, willing and responsible family member, friend or other third party and that John Thomas Walker is willing and capable of accepting voluntary treatment, then you must find that John Thomas Walker is not gravely disabled.*

---

[2] Welfare and Institutions Code section 5000 et seq. All statutory references are to the Welfare and Institutions Code unless otherwise specified.

"In determining whether John Thomas Walker is gravely disabled you must consider all relevant facts presented at this trial." (Italics added.)

These instructions are erroneous.

■ The LPS Act permits a conservatorship to be recommended when a professional person determines an individual is both (1) gravely disabled *and* (2) unwilling or incapable of voluntarily accepting treatment. (§ 5352.)[3] One is gravely disabled when unable to provide for basic personal needs of food, clothing, or shelter. (§ 5008, subd. (h).)[4] It follows that if persons provide for their basic personal needs (i.e. are not gravely disabled) *or* are able to voluntarily accept treatment, there is no need for a conservatorship. ■ ■ ■ ■ The instructions here erroneously told the jury a conservatorship may not be imposed only if a person can provide for his needs *and* is willing to accept treatment.[5]

Under the LPS Act statutory scheme, if a professional observes a person cannot meet his basic needs, the professional will seek to place the person under the care of an appropriate treatment program. If the person voluntarily accepts treatment, the treatment program will presumably ensure the person's basic needs are met, and conservatorship will not be recommended. However, if the person will not voluntarily accept treatment, the professional will recommend a conservatorship.

■ A proposed conservatee has the right to have a jury determine all the issues relevant to the establishment of the conservatorship. (See *Conservatorship of Davis* (1981) 124 Cal.App.3d 313, 324 [177 Cal.Rptr. 369].) The jury should determine if the person voluntarily accepts meaningful treatment, in which case no conservatorship is necessary. If the jury finds the

---

[3] Section 5352 provides: "When the professional person in charge . . . determines that a person in his care is gravely disabled as a result of mental disorder . . . and is unwilling to accept, or incapable of accepting, treatment voluntarily, he may recommend conservatorship to the officer providing conservatorship investigation . . . ."

[4] Section 5008, subdivision (h) provides: " . . . 'gravely disabled' means: [¶] (1) A condition in which a person, as a result of a mental disorder, is unable to provide for his basic personal needs for food, clothing, or shelter; . . ."

Section 5350 provides: "A conservator of the person . . . may be appointed for any person who is gravely disabled as a result of mental disorder . . . .[¶] . . . The person for whom conservatorship is sought shall have the right to demand a court or jury trial on the issue whether he is gravely disabled. . . ."

[5] The County argues John waived his right to complain since his counsel did not object to this instruction. A proposed conservatee is entitled to procedural due process protections similar to a criminal defendant since fundamental liberty rights are at stake. (See *Conservatorship of Roulet* (1979) 23 Cal.3d 219, 223-235 [152 Cal.Rptr. 425, 590 P.2d 1].) The trial court had a sua sponte duty to correctly instruct on the general principles of law necessary for the jury's understanding of the case. (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 715 [112 Cal.Rptr. 1, 518 P.2d 913].)

person will not accept treatment, then it must determine if the person can meet his basic needs on his own or with help, in which case a conservatorship is not justified.

This interpretation of the LPS Act is not only supported by the plain language of the statute, but is consistent with the recognition that a conservator has power over a conservatee's fundamental liberty rights and thus a conservatorship should only be established after all suitable alternatives have been considered. (*Conservatorship of Davis, supra,* 124 Cal.App.3d at pp. 324-325.) These alternatives include the willingness and capability of the proposed conservatee to voluntarily accept treatment and whether the individual is capable of surviving safely in freedom by himself or with the help of family, friends, or other third parties. (*Id.* at p. 325.)

In *Davis,* the jury was instructed essentially as follows: (1) An individual who could survive safely alone or with help, was not gravely disabled. (2) Before considering whether one is gravely disabled, the person must be found to be unwilling or unable to voluntarily accept treatment. A person capable and willing to make a meaningful commitment to a plan of treatment, is not gravely disabled. (*Id.* at p. 319.)[6] The instructions in *Davis* properly told the jury that proof of either of the two alternatives was sufficient to avoid a conservatorship. (See also *Conservatorship of Baber* (1984) 153 Cal.App.3d 542, 552 [200 Cal.Rptr. 262].)

 In contrast here, the instructions erroneously advise that John must both be able to survive safely on his own or with help *and* be willing to voluntarily accept treatment. Under this instruction a conservatorship may be established merely because one refuses treatment even if that person otherwise can meet his or her basic needs. Such a result is contrary to the LPS Act's mandate that a person is gravely disabled, so as to justify the serious deprivation of their liberty rights arising from a conservatorship, *only if* they cannot provide for their basic personal needs for food, clothing, or shelter. (§ 5008, subd. (h); see *Conservatorship of Roulet, supra,* 23 Cal.3d at p. 225.) The LPS Act conspicuously does *not* state that persons are gravely disabled solely because they refuse treatment for a mental illness. (See *Conservatorship of Chambers* (1977) 71 Cal.App.3d 277, 284-285 [139 Cal.Rptr. 357] [LPS Act's substitution of "gravely disabled" for "in need of

---

[6]The issue in *Davis* was whether the jury should be instructed that a person was not gravely disabled if he or she could survive with the help of others. (*Id.* at pp. 320-321, 329.) *Davis's* affirmative holding was approved in *Conservatorship of Early* (1983) 35 Cal.3d 244, 250 [197 Cal.Rptr. 539, 673 P.2d 209]. In *Early,* the court declined to address the legal issue of whether the trial court erred in refusing an instruction that the individual was not gravely disabled if he voluntarily accepted treatment, since in the case before it the individual consistently refused treatment. (*Id.* at pp. 255-256.)

treatment" standard reflects its constitutional preciseness]; *Conservatorship of Smith* (1986) 187 Cal.App.3d 903, 908-910 [232 Cal.Rptr. 277].)

In short, the structure of the LPS Act preserves the right of nondangerous[7] persons to refuse treatment as long as they can provide for their basic needs, even if they have been diagnosed as mentally ill. The instruction given here improperly requires that a person accept treatment in order to avoid a conservatorship.

Since John admitted he would not take medication on his own, under the instructions the jury could have erroneously found he was gravely disabled merely because he was unwilling to accept treatment, regardless of whether he could otherwise provide for his needs. ■ The standard in conservatorship proceedings requires that error be harmless beyond a reasonable doubt. (See *Conservatorship of Early, supra,* 35 Cal.3d at p. 255.) ■ The facts indicate that as a matter of law no jury could find John, on his own or with family help, capable of meeting his basic needs for food, clothing or shelter. Thus, the error was harmless beyond a reasonable doubt.

## III

The court defined the distinctions between direct and circumstantial evidence and instructed the jury that the law does not distinguish between them as to the degree of proof required. (BAJI No. 2.00.)[8] Although the court used the form instruction prepared for use in civil cases, BAJI, this legal concept applies to even criminal matters. The same admonition is contained in CALJIC No. 2.00 (1979 rev.). Both BAJI and CALJIC stress neither direct nor circumstantial evidence is entitled to greater weight than the other. ■ However, the court rejected John's proposed instruction generally in the language of CALJIC No. 2.01. (Proposed Instruction No. 15.)[9] This proposed instruction would have told jurors a finding of grave

---

[7] The treatment of persons dangerous to others or themselves is covered in other sections of the LPS Act.

[8] The court instructed as to BAJI No. 2.00 as follows: "Evidence may be either direct or circumstantial. It is direct evidence if it proves a fact without an inference and which in itself, if true, conclusively establishes that fact. It is circumstantial evidence if it proves a fact from which an inference of the existence of another fact may be drawn.

"An inference is a deduction of fact that may logically and reasonably be drawn from another fact or a group of facts esablished by the evidence.

"The law makes no distinction between direct and circumstantial evidence as to the degree of proof required. Each is accepted as a reasonable method of proof, and each is respected for such convincing force as it may carry."

[9] The refused instruction as to modified CALJIC No. 2.01 stated: "A finding of gravely disabled may not be based on circumstantial evidence unless the proved circumstances are not only (1) consistent with the theory that the respondent has a mental disorder and cannot pro-

disability could not be made on evidence which is substantially circumstantial unless the proved circumstances are not only consistent with the legal elements of that status, but cannot be reconciled with any other rational conclusion. The court's rejection was not based on a belief the proposal was legally incorrect, but rather on its mistaken belief the instruction was already being given, stating, "This is *BAJI* 2.01 modified. I've given 2.01 in the unmodified form. So I'm refusing Respondent's Proposed No. 15." The court simply misread the proposed instruction which stated it was authorized by *CALJIC* No. 2.01, not *BAJI*. Further, although BAJI No. 2.01 was given, it is on an issue unrelated to the evidentiary process required to prove the ultimate fact where the burden of proof is beyond a reasonable doubt. Thus, the rejected proposition of law was not covered in the given instructions.

■ The concept that a trier of fact may not find an ultimate fact to be proved on circumstantial evidence alone except as set forth in CALJIC No. 2.01, has its origin and development in criminal law. Its acceptance in that milieu is complete; in criminal cases, CALJIC No. 2.01 is required sua sponte when circumstantial evidence from which a reasonable inference of innocence could be drawn is substantially relied upon to prove guilt. (*People v. Wiley* (1976) 18 Cal.3d 162, 174 [133 Cal.Rptr. 135, 554 P.2d 881]; *People v. Yrigoyen* (1955) 45 Cal.2d 46, 49 [286 P.2d 1].)

■ CALJIC No. 2.01 clarifies the application of the general doctrine requiring proof beyond a reasonable doubt to a case in which guilt must be inferred from a pattern of incriminating circumstances. (See *People v. Gould* (1960) 54 Cal.2d 621, 629 [7 Cal.Rptr. 273, 354 P.2d 865].) The instruction deals with proof of each fact essential to complete the chain of circumstances establishing guilt and with the use of evidence susceptible of two interpretations—i.e., either guilt or innocence. (*Ibid.*; *People v. Jerman* (1946) 29 Cal.2d 189, 197 [173 P.2d 805].)

---

vide for his basic personal needs, but (2) cannot be reconciled with any other rational conclusion.

"Further, each fact which is essential to complete a set of circumstances necessary to establish the respondent's grave disability must be proved beyond a reasonable doubt. In other words, before an inference essential to establish grave disability may be found to have been proved beyond a reasonable doubt, each fact or circumstance upon which such inference necessarily rests must be proved beyond a reasonable doubt.

"Also, if the circumstantial evidence is susceptible of two reasonable interpretations, one of which points to the respondent's grave disability and the other to his not being gravely disabled, it is your duty to adopt that interpretation which points to the respondent's not being gravely disabled, and reject that interpretation which points to his being gravely disabled.

"If, on the other hand, one interpretation of such evidence appears to you to be reasonable and the other interpretation to be unreasonable, it would be your duty to accept the reasonable interpretation and to reject the unreasonable."

■ When proof of guilt is wholly or substantially dependent on inferences to be drawn from a set of circumstances, the instruction must be given so the jury can properly evaluate whether there is enough evidence to support the conviction to the degree required by the applicable burden of proof. Although both circumstantial and direct evidence are entitled to the same weight when proving facts, the use of circumstantial evidence is governed by specific rules when proof of the ultimate fact is entirely or substantially dependent on circumstantial evidence. (*People* v. *Bender* (1945) 27 Cal.2d 164, 175 [163 P.2d 8].) Thus, the rule developed in those cases to which the reasonable doubt standard was historically unique, crimes; i.e., that " 'the facts or circumstances must not only be entirely consistent with the theory of guilt but must be inconsistent with any other rational conclusion.' It cannot be too strongly emphasized that such quoted statement enunciates a most important rule governing the use of circumstantial evidence. In unequivocal language it should be declared to the jury . . . ." (*Ibid.*) The instruction regarding the use of circumstantial evidence to prove guilt must be specifically given. It is not sufficient to merely give the instruction defining the general standard of proof beyond a reasonable doubt. (*Id.* at pp. 175-176.)

■ The evidence from which the jurors were to determine whether John was a gravely disabled person was substantially, if not completely, circumstantial. Family members testified to John's perceived behavior pattern, not to whether he was gravely disabled.

The County does not contend the evidence of John's condition is not substantially circumstantial. It argues only that the rationale for instructing on the principles expressed in CALJIC No. 2.01 applies solely to criminal cases, while conservatorship proceedings are civil in nature.[10] However, we perceive the issue as turning on whether the burden of proof is beyond a reasonable doubt or some lesser standard. The concept expressed in CALJIC No. 2.01 is stated in terms of reasonable doubt. Its admonition is framed in that reference, not whether penal or civil consequences will flow from the jury verdict.[11]

As stated in *People* v. *Hatchett* (1944) 63 Cal.App.2d 144, 155 [146 P.2d 469]: "To the legally trained mind the doctrine of reasonable doubt has a

[10] The County cites Probate Code section 1827 which applies by virtue of the mandate of Welfare and Institutions Code section 5350. Section 5350 states procedures for establishing conservatorships for gravely disabled persons should be the same as set forth in Division 4 (including section 1827) of the Probate Code. The latter statute states conservatorships shall be established by the law and procedures relating to civil trials.

[11] However, considerable stress on the penal aspects of convictions is contained in decisions requiring CALJIC No. 2.01 to be given sua sponte in criminal cases.

scope much broader than would be easily understood by inexperienced jurors. The rule under which circumstantial evidence is to be weighed is not one which would be suggested to the lay mind by instructions that doubts are to be resolved in favor of the accused. This is sufficiently proved by the fact that through long experience it has become an established practice in the courts to state the rule in distinct and specific form, to serve as an easily understood and safe guide for juries in weighing the sufficiency of circumstantial evidence. Simplicity in the statement of legal principles adds greatly to their efficacy; statements of abstract principles which leave the jury in doubt as to their proper application tend toward confusion. Neither the statement in an instruction that the guilt of the defendant must be established beyond a reasonable doubt, nor the statement that as between two opposing reasonable inferences the one which is consistent with innocence must be preferred to the one tending to show guilt, satisfies the right of the defendant to have the jury instructed that where circumstantial evidence is relied upon by the People it must be irreconcilable with the theory of innocence in order to furnish a sound basis for conviction."

An earlier instruction containing the substance of the principle now stated in the second paragraph of CALJIC No. 2.01 was described as applying the doctrine of reasonable doubt to proof of each fact essential to the chain of circumstances establishing guilt. (*People* v. *Watson* (1956) 46 Cal.2d 818, 831 [299 P.2d 243].) The former instructions containing other portions of CALJIC No. 2.01 were said to establish the principle that circumstantial evidence must be inconsistent with any other hypothesis. (*People* v. *Koenig* (1946) 29 Cal.2d 87, 93 [173 P.2d 1], disapproved on other grounds in *People* v. *Gould, supra,* 54 Cal.2d at p. 630.) Finally, in *People* v. *Bender, supra,* 27 Cal.2d at page 175, the court emphasizes the necessity of such instructions in criminal cases where circumstantial evidence is substantially relied upon to adequately inform the jurors of rules governing the application of such evidence.

Although it has been said that the necessity for distinguishing between direct and circumstantial evidence arises out of the demands of the criminal law, to give meaning to the presumption of innocence (Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 19.3, p. 455) the only protective effect of this presumption is to place the burden of proof on the People beyond a reasonable doubt. (Pen. Code, § 1096.) Thus, it is the burden of proof beyond reasonable doubt which triggers the application of the evidentiary principles expressed in CALJIC No. 2.01.

Until the decision in *Conservatorship of Roulet, supra,* 23 Cal.3d 219, grave disability could be established by a nonunanimous jury verdict supported by a preponderance of the evidence. *Roulet* rejected the argument

that section 5350 permits nonunanimous jury verdicts as in civil cases. It held that rote reliance on section 5350 and its reference to civil proceedings would run afoul of the due process clause of the California Constitution. The Supreme Court required future establishments be based on proof beyond reasonable doubt and unanimous jury verdicts. (*Id*. at p. 235.) While the *Roulet* holding does not transform conservatorship hearings into criminal cases, it does establish that legal concepts relating to evidentiary and proof burdens are not determined solely by whether the proceedings are labeled civil or criminal. ■ Thus, instructions as to the evidentiary process required to reach a verdict beyond a reasonable doubt based substantially on circumstantial evidence relate to the burden of proof, not whether the trial is labeled criminal. Moreover, even in civil cases parties are entitled to instructions relevant to the facts and legal theories on request. (See generally, 7 Witkin, Cal. Procedure (3d ed. 1985) Trial § 240, pp. 246-247.) Where a noncriminal case is to be evaluated by a reasonable doubt standard, it follows that a party on a proper state of the evidence is entitled on request to have jurors informed of the manner in which that standard must be established when the evidence consists substantially of circumstantial evidence. As stated in *People* v. *Hatchett, supra,* 63 Cal.App.2d at page 155, the rule is not one ordinarily suggested to the lay mind by related instructions.[12]

■ However, although we hold CALJIC No. 2.01 is generally relevant in conservatorship trials to establish grave disability, John is not entitled to his requested instruction on the facts of this case. The court has no duty to give the requested instruction in a case where the circumstantial evidence necessary to prove a certain mental state is not subject to any inference except that pointing to the existence of that mental state. (*People* v. *Wiley, supra,* 18 Cal.3d at p. 176; *People* v. *Morrison* (1979) 92 Cal.App.3d 787, 794 [155 Cal.Rptr. 152].) John's conduct in an unmedicated state and his testimony that he would not take medication or accept treatment unless compelled to do so, point unerringly to only one conclusion: that he suffers from a mental disorder which prevents him from providing for his food, clothing and shelter. Thus, the court did not err in refusing to instruct on the principles contained in CALJIC No. 2.01.

### IV

■ The trial court instructed the jury that the burden of proof was the same as in a criminal case, and the petitioner must prove that John is gravely disabled beyond a reasonable doubt. The trial court rejected John's

---

[12]Because it is not necessary to our resolution of this appeal, we do not address John's argument regarding whether the court has a sua sponte duty to give an instruction akin to CALJIC No. 2.01 in conservatorship trials.

proposed instruction which included a statement that a person is presumed not gravely disabled until the contrary is proven.

A criminal defendant has a sua sponte right to have the jury instructed in the language of Penal Code section 1096: "A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to an acquittal, but the effect of this presumption is only to place upon the state the burden of proving him guilty beyond a reasonable doubt. . . :" (See Pen. Code, § 1096a; CALJIC No. 2.90.) A proposed conservatee has a constitutional right to a finding based on proof beyond a reasonable doubt. (*Conservatorship of Roulet, supra,* 23 Cal.3d at p. 235.) Without deciding whether the court has a sua sponte duty to so instruct, we are satisfied that, on request, a court is required to instruct in language emphasizing a proposed conservatee is presumed to not be gravely disabled until the state carries its burden of proof.

However, the error is harmless beyond a reasonable doubt. The only effect of the presumption is to insure that the state proves its case beyond a reasonable doubt. The jury here was fully instructed as to the effect of the presumption and could not have been prejudiced by the failure to denominate the presumption.

V

The trial court denied John's request for an instruction stating symptoms of a mental disorder (i.e., psychosis, bizarre behavior, delusions, hallucinations) are not sufficient to justify a finding of grave disability, unless because of the symptoms the person cannot provide for his basic personal needs.

If a defendant desires more specific or explicit instructions, he should request them (*People* v. *Carothers* (1946) 77 Cal.App.2d 252, 254 [175 P.2d 30]), which John properly did here. The trial court may properly refuse the additional instructions if they are repetitive and merely restate legal principles in another manner. (*People* v. *Frye* (1985) 166 Cal.App.3d 941, 952 [213 Cal.Rptr. 319].)

Here, the jury was instructed, in accord with the language of section 5008, subdivision (h), that "gravely disabled" means a condition in which a person, as a result of a mental disorder, is unable to provide for his basic personal needs for food, clothing, or shelter. The import of this instruction is that symptoms of mental disorder are not enough to establish grave disability. Although John's additional requested instruction would

have expressly clarified this point and is not unduly repetitive, the point was adequately covered in the given instruction.

## VI

 John was denied a requested instruction stating that an individual's objections and reactions to involuntary confinement in a mental hospital do not in themselves prove he is mentally ill. In *Conservatorship of Roulet, supra,* 23 Cal.3d at page 234, footnote 13, the court observed that testimony about an individual's failure to adjust to a hospital setting is frequently relied on to support a finding of grave disability, when in fact that testimony may have little bearing on whether an individual is unable to provide for his basic needs. The court noted "an individual's frantic or desperate reactions to involuntary commitment in a mental hospital do not, in themselves, prove that he is mentally ill." (*Id.* at p. 234.) A trial court should give requested instructions on every material question upon which there is evidence substantial enough to warrant consideration by the jury. (*People* v. *Flannel* (1979) 25 Cal.3d 668, 684 [160 Cal.Rptr. 84, 603 P.2d 1].) Assuming the instruction might be appropriate in some cases, here the facts do not raise an issue as to whether John's negative reaction to confinement was indicative of mental illness or inability to provide for his needs. John stated he did not like it at the Alpine facility and his sister testified he ran away from the facility on one occasion. His dislike of and departure from the facility was relevant to show he would not voluntarily accept treatment. However, there were no facts presented which suggested his dislikes of the facility showed he was mentally ill or incapable of providing for his needs. The instruction was not relevant to the facts and was properly refused.

## VII

 John contends the trial court abused its discretion in denying his requested hearing on who should serve as conservator and preemptorily appointing the public conservator. We conclude the issue of whether a family member would be willing to serve as conservator was not adequately addressed.

The LPS Act requires the conservatorship investigation report to designate the most suitable person to serve as conservator. (§ 5355.) The court may consider the contents of the report in rendering its judgment. (§ 5354.)[13] The appointment of a conservator is subject to the list of priori-

---

[13] The report is not admissible, however, during the trial stage when the issue of grave disability is being litigated. (*Conservatorship of Manton, supra,* 39 Cal.3d at p. 651.)

ties in Probate Code section 1812, unless the conservatorship investigator recommends otherwise. (§ 5350, subd. (b).) ■ Probate Code section 1812 states preference is to be given in the following order: the spouse, an adult child, a parent, a brother or sister, and any other person eligible. Although the LPS Act does not expressly state the conservatorship investigator should follow the priorities in Probate Code section 1812, "[t]he preferable interpretation would require that the conservatorship investigator adhere to the list of priorities as establishing the legislature's belief about who is probably the most suitable person to serve as conservator in the typical case." (Morris, *Conservatorship for the "Gravely Disabled": California's Nondeclaration of Nonindependence* (1978) 15 San Diego L.Rev. 201, 226.)

■ John's conservatorship investigation report indicates that John's mother requested a neutral party and the investigator concurred. The report does not indicate the investigator discussed the issue with John's father, sister, or brother-in-law, any of whom may have been willing and able to serve as John's conservator although unwilling to house him in their home. Although section 5350, subdivision (b) suggests the investigator's recommendation takes priority over the list of priorities in the Probate Code, the trial court should evaluate the basis of the recommendation. If the investigation was deficient, the trial court should make further inquiry. Here, there is no evidence that John's father or sister had been polled on this issue. John's father has equal statutory priority with his mother and both he and the sister may have been acceptable to the investigator had an inquiry been made. If the investigator did, in fact, have reason to prefer a neutral party over these relatives, or if they were not willing to act as conservator, it would be a simple procedure for the court to ascertain these facts. We conclude it was an abuse of discretion for the trial court to rely only on a report which did not justify negating the possibility of appointing immediate family members.

Our conclusion is buttressed by recent amendments to the LPS Act, which became effective in January 1987, after John's August 1986 hearing. The statute now provides: "*The public guardian shall serve as conservator* of any person found by a court under this chapter to be gravely disabled, if the court recommends the conservatorship after a conservatorship investigation, *and if the court finds that no other person or entity is willing and able to serve as conservator.*" (§ 5354.5, italics added.)

The trial court's summary appointment of the public conservator was erroneously made over John's objection without a full determination that family members, obviously interested in John's welfare, were unwilling to serve.

## DISPOSITION

The order establishing a conservatorship is affirmed. The order designating the public conservator is reversed and the case is remanded for further hearing.

Wiener, Acting P. J., and Benke, J., concurred.

A petition for a rehearing was denied January 5, 1988.