Filed 4/19/13  P. v. Hicks CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RICK HICKS,<br><br>    Defendant and Appellant. | F064190<br><br>(Super. Ct. No. CRP35989)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tuolumne County.  Eleanor Provost, Judge.

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans, Deputy Attorney General, for Plaintiff and Respondent.

-ooOoo-

After a jury found appellant Rick Lee Hicks to be a sexually violent predator (SVP), the trial court committed him to the custody of the Department of Mental Health (DMH) for an indeterminate term under the Sexually Violent Predator Act (SVPA) (Welf. & Inst. Code,

§ 6600 et seq.).[1] Hicks appeals, contending (1) that the trial court prejudicially erred when it accepted defense counsel's waiver of a probable cause hearing without obtaining Hicks's personal waiver of that hearing; (2) that the trial court committed reversible error when it declined to instruct on circumstantial evidence; and (3) that there was insufficient evidence that Hicks would likely commit a future predatory offense without appropriate treatment in a custodial setting. We disagree and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Hicks was born in 1971 and was 40 years old at the time of trial.

In 1990, when Hicks was 18 or 19, he orally copulated and sodomized a five-year-old male cousin. He was convicted of violating Penal Code section 288, subdivision (a), committing a lewd or lascivious act on a child under the age of 14. Hicks admitted to police that he first molested this same victim two years prior to the crimes resulting in conviction. Hicks had attempted suicide, been hospitalized, and gone into a group home before resuming the molestations and getting "caught," because he was "unable to control his sexual urges."

Hicks testified that he was "15 going on 16" when he first molested the victim of his 1990 crime. Hicks was living with the victim's family, his aunt and uncle, at the time and was "attracted to" the victim when he "had his diaper off" and he "acted on that impulse." His 1990 conduct included orally copulating the victim and masturbating in the victim's presence. He denied sodomizing the victim. For his conviction, he received eight months in county jail, three years probation, and was ordered to undergo counseling at a program called "Parents United." He was 18 years old when he began the program. Although he completed "five different phases" of the program, he thought the program was a failure

---

**1**　All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

because he had not yet been diagnosed as a pedophile, so he did not understand his "mental disorder."

In 1996, Hicks was convicted of violating Penal Code section 647.6, annoying and/or molesting a child, a misdemeanor offense. That offense involved the 11-year-old son of a friend with whom Hicks spent "a lot of time" "cultivat[ing]" a relationship by taking the victim camping or rafting and then asking him to orally copulate Hicks. Hicks testified that the boy's mother was his best friend and that he had known the child for three to four years. He described his crime as asking the child if he could "suck" the child's penis. Hicks stated that he acted on "impulse," in part because he was stressed by his mother's recent death.

In 1999, Hicks was again convicted of a violation of Penal Code section 288, subdivision (a), committing a lewd or lascivious act on a child under the age of 14. This time Hicks testified that he "found" himself attracted to his three-year-old cousin and, acting on "impulse," orally copulated her and masturbated to the point of ejaculation on her "vagina area." He also penetrated her anus with his fingers. Hicks admitted to police that he molested this victim "seven or eight times." Hicks was committed to prison for 12 years and while there attended weekly A.A. meetings and, according to him, took "advantage of … every resource or program that was available," including working with a psychologist who had expertise in sex offenses. At the end of his prison term, Hicks, by now age 39, received 15 months of counseling at Atascadero State Hospital as a mentally disordered offender. It was at Atascadero that he was diagnosed with and treated for pedophilia and polysubstance dependence. And it was there that Hicks also began to develop his "relapse prevention plan," learning to "keep away" from small children by avoiding "triggers" like certain television programs and going to places like McDonalds and malls or stores where children are present, and by not forming relationships with people who have small children.

According to Hicks, when he was paroled from Atascadero in July of 2010, he spoke to a psychologist about his pedophilia and substance abuse issues. He got a job at a food processing plant in August of 2010, began "the process of re-enrolling" at a community

college, and became active in N.A. and A.A., and also attending a weekly "step study group." He tested monthly for drugs, lived in a "structured halfway house," and was registered as a sex offender.

Hicks committed his most recent sexual offense in January of 2011, a violation of parole, which involved repeatedly grabbing the genital area of one of his coworkers. Hicks denied being the aggressor and claimed instead to be the victim. The coworker was described as a young adult who looked like a minor, under the age of 18. Hicks testified that, while on parole and working at the food processing plant, he became attracted to a 22-year-old coworker. Hicks described the attraction as mutual and that they played a game in which they would "smack" each other on the butt. At one point, the coworker sent a picture of his penis to Hicks's cell phone. Hicks described an incident at work where the coworker was pulling a water hose between his legs and waving it at Hicks "like a penis." Hicks grabbed the hose and, in the process, "probably grazed [the coworker's] hip and leg" with his hand. The coworker filed a sexual harassment complaint and Hicks was suspended and then terminated from his job.

For his commitment proceedings, Hicks was interviewed in June of 2011 by two psychologists hired by the prosecution – Dr. Carolyn Murphy and Dr. Michael Selby. Both Dr. Murphy and Dr. Selby were of the opinion that Hicks was likely to reoffend in a sexually violent predatory manner, based on his history of prior sexual predatory offenses and current diagnosed mental disorder of pedophilia and substance abuse issues. Dr. Murphy assessed Hicks's risk of reoffense as "moderate to high," which equated to a 20 to 29.6 percent risk of reoffense, using two actuarial tools, the Static-99R and Static-2002R. Dr. Selby opined that, absent "highly structured" sex offender and substance abuse

4.

treatment in a custodial setting, there was a "serious and well-founded risk" that Hicks would reoffend.[2]

Paul E. Patterson, the "principal of a middle school" and "minister of a church in Modesto," who had known Hicks for 21 or 22 years, testified that he and Hicks had had a "committed relationship that lasted for ten years," during which they lived together. Patterson was aware of Hicks's conviction for child molestation and that he had had a "reoffense" involving a "young lady." Patterson stayed in contact with Hicks while he was in prison and was willing to support Hicks if he was released, would allow him to live with him if he needed a place to stay, and he had an adequate salary and was able to assist Hicks financially. Prior to helping Hicks, Patterson would insist that Hicks agree not to "be around kids right now at all."

Hicks testified that, at the time of his prior criminal conduct, he had no understanding of his "mental disorder," and so had "no self-control." He had since gotten past his shame and guilt and was now motivated to recover "and never offend again." Hicks believed he now had the "right tools" in the form of his "elaborate relapse prevention plan," although he conceded "there are no guarantees in life." According to Hicks, Drs. Murphy and Selby asked him a lot of "generic" questions that were "vague" and without "depth," but neither asked him about his prior treatment or "behavior chains."

Hicks, who was currently in jail, testified that, when released, he had a job offer with a tax service, he had a place to stay, and Patterson and other friends had offered to help him financially. He would continue to seek treatment for pedophilia and continue his involvement in A.A. and N.A.

---

[2]     Because one of Hicks' three contentions on appeal involves the sufficiency of the evidence to support the jury's finding that he met the criteria for an SVP, we will defer a discussion of additional trial evidence to the portion of the opinion where we address that issue.

## DISCUSSION

We discuss Hicks's various appellate challenges below, after providing a general overview of the SVPA.

### Overview of the SVPA

"The SVPA … provides for the involuntary civil commitment of certain offenders, following the completion of their prison terms, who are found to be SVP's because they have previously been convicted of sexually violent crimes and currently suffer diagnosed mental disorders which make them dangerous in that they are likely to engage in sexually violent criminal behavior.  [Citation.]"  (*People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 902; § 6600, subd. (a)(1).)  A "diagnosed mental disorder" is defined to include "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others."  (§ 6600, subd. (c).)

The initial identification of a possible SVP begins with a screening by the Department of Corrections and Rehabilitation (DCR) and the Board of Parole Hearings of the "social, criminal, and institutional history" of an individual, who is either serving a determinate prison sentence or whose parole has been revoked, for the commission of "a sexually violent predatory offense."  (§ 6601, subds. (a) & (b).)  The screening is conducted in accord with an assessment protocol developed by the DMH.  (*People v. Hurtado* (2002) 28 Cal.4th 1179, 1182-1183.)   If that screening leads to a determination that the defendant is likely to be a sexually violent predator, the defendant is referred to the DMH for an evaluation by two psychiatrists or psychologists.  (§ 6601, subds. (b) & (c).)  If both find that the defendant has a "diagnosed mental disorder so that he or she is likely to engage in acts of sexual violence without appropriate treatment and custody" (§ 6601, subd. (d)), the DMH forwards a petition for commitment to the county of the defendant's last conviction.  (*Ibid.*)  If the county's designated counsel concurs with the recommendation, he or she files a petition for commitment in the superior court.  (§ 6601, subd. (i).)

6.

Upon filing of the SVPA commitment petition, the superior court must review the petition and determine "whether the petition states or contains sufficient facts that, if true, would constitute probable cause to believe that the [defendant] is likely to engage in sexually violent predatory criminal behavior upon his or her release." (§ 6601.5.) If the court determines the petition on its face supports a finding of probable cause, it then orders the defendant to be kept in a secure facility until a probable cause hearing under section 6602 is conducted. (§ 6601.5.) The probable cause hearing must be conducted within 10 calendar days of the issuance of the order. (*Ibid.*)

The purpose of the probable cause hearing is to determine whether "there is probable cause to believe that the [defendant] is likely to engage in sexually violent predatory criminal behavior upon his or her release." (§ 6602, subd. (a).) The probable cause hearing is an adversarial hearing where the [defendant] has the right to counsel, to present "oral and written evidence," and to "'challenge the accuracy'" of the evaluations by cross-examination of the experts. (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 245, fn. 8; § 6602, subd. (a).) If the court finds probable cause, it orders a trial to determine whether the defendant is a sexually violent predator under section 6600. (§ 6602, subd. (a).)

The individual named in the petition is entitled to a jury trial, and the jury's verdict must be unanimous. (§ 6603, subds. (a) & (f).) The individual is also entitled to retain experts and professional persons to perform an examination on his or her behalf. (§ 6603, subd. (a).) At trial, the trier of fact determines whether, beyond a reasonable doubt, the individual is a SVP. (§ 6604.) If the trier of fact determines the individual is a SVP, that person is committed for an indefinite term to the custody of the DMH for appropriate treatment and confinement in a secure facility designated by the DMH. (*Ibid.*)

I. WAIVER OF PROBABLE CAUSE HEARING

First, Hicks contends that the trial court erred prejudicially when it accepted defense counsel's waiver of a probable cause hearing without obtaining a personal waiver from him. We disagree.

7.

On July 8, 2011, the prosecutor filed the SVP petition, with the prosecutor's declaration and the reports of Drs. Selby and Murphy attached. On July 12, 2011, Judge Provost filed an order setting a probable cause hearing on July 29, 2011. On July 29, 2011, Judge Boyack appointed the public defender to represent Hicks and set the matter over to August 3, 2011, in "Department 4" because Judge Provost was "more familiar with the ins and outs of these cases .…" On August 3, 2011, Hicks appeared with counsel again before Judge Boyack. Hick's counsel asked for another continuance and that, once the case got to Judge Provost's department, "we'll waive time and have the matter set for jury trial." Judge Boyack granted the continuance. At the conclusion of the hearing, the following exchange occurred:

> "[Prosecutor]: Your Honor, at this point, I assume there is a stipulation to probable cause for continuing custody at this point?
>
> "[The Court]: Oh, that is a good point. [¶] [Defense counsel]?
>
> "[Defense Counsel]: We would so stipulate.
>
> "[The Court]: Okay. [¶] The Court, having reviewed the report, finds there is probable cause to continue Mr. Hicks in custody pending trial."

Hicks contends, and respondent does not disagree, that this exchange meant that the trial court accepted defense counsel's waiver of a probable cause hearing without advising Hicks of his right to that hearing and without eliciting a personal waiver. Unlike Hicks, however, respondent contends that the waiver was valid as no personal waiver was required and that, in any event, no prejudicial error occurred. We agree with respondent.

As stated previously, upon filing of the SVPA commitment petition, the superior court must review the petition and determine "whether the petition states or contains sufficient facts that, if true, would constitute probable cause to believe that the individual named in the petition is likely to engage in sexually violent predatory criminal behavior upon his or her release." (§ 6601.5.) If the court determines the petition on its face supports a finding of probable cause, then it orders the person named in the petition to be kept in a

secure facility until a probable cause hearing under section 6602 is conducted.  (§ 6601.5.)  The probable cause hearing must be conducted within 10 calendar days of the issuance of the order.  (*Ibid.*)

The probable cause hearing in an SVPA case, like the preliminary hearing in a criminal case, tests the sufficiency of the evidence behind the allegations and protects the accused from having to face trial on groundless charges.  (*Cooley v. Superior Court, supra,* 29 Cal.4th at p. 247; *People v. Hayes* (2006) 137 Cal.App.4th 34, 43.)  The probable cause hearing "is only a preliminary determination that cannot form the basis of a civil commitment; the ultimate determination of whether an individual can be committed as an SVP is made only at trial.  (§ 6604.)"  (*Cooley v. Superior Court, supra,* at p. 247.)

Hicks contends that, because of the importance of the statutory scheme of SVP commitment and the mandatory language requiring a probable cause hearing, a potential SVP committee must be informed of the right to the probable cause hearing and must make a knowing and intelligent waiver of his right to that hearing.  Hicks cites *People v. Hayes, supra,* 137 Cal.App.4th at p. 48, which states:

> "[T]he text of section 6602, subdivision (a) renders the probable cause hearing mandatory: 'A judge of the superior court *shall* review the petition and *shall* determine whether there is probable cause ….'  (Italics added.)  As such, a probable cause hearing is a mandatory procedural safeguard.  [Citations.]"

But it should be noted that, in this case, the trial court did review the petition and did determine there was probable cause.

Hicks, noting the analogy of a probable cause hearing in an SVPA case to a felony preliminary hearing, also relies on Penal Code section 859b, subdivision (a), which he contends requires personal waiver of a felony preliminary hearing.  (*People v. Kowalski* (1987) 196 Cal.App.3d 174, 176-177.)  But, as noted by respondent, Penal Code section 859b, subdivision (a) requires that a defendant "personally" waive the right to a speedy preliminary hearing, or the "right to preliminary examination within the 10 court days," not the right to a preliminary hearing itself.  Instead, the waiver of the right to the preliminary

9.

hearing itself is governed by Penal Code section 860, which allows a defendant "represented by counsel" to "waive the right to" a preliminary hearing, with no requirement that the defendant personally waive that right. (See, e.g., *In re Gregory* (1927) 86 Cal.App. 10, 11-12 [defendant represented by counsel may waive the right to a preliminary hearing]; *People v. White* (1963) 213 Cal.App.2d 171, 174 [same].)

In any event, even if we determine that Hicks was erroneously denied the personal right to waive the probable cause hearing, the standard of review of such an error, as in a preliminary hearing in a criminal case, is harmless error, which requires reversal "'only if [the] defendant can show that he was deprived of a fair trial or otherwise suffered prejudice as a result of the error ….'" (*People v. Hayes, supra,* 137 Cal.App.4th at p. 50, citing *People v. Pompa-Ortiz* (1980) 27 Cal.3d 519, 529-530.) Hicks fails to show that, if he had had a probable cause hearing, it was reasonably probable he would have been screened out or a finding of probable cause would not have been made by the trial court. We therefore reject his contention.

## II. FAILURE TO GIVE INSTRUCTION ON CIRCUMSTANTIAL EVIDENCE

During an in camera discussion on jury instructions, the parties and trial court questioned whether instruction on circumstantial evidence was necessary. Eventually, the trial court stated that it would not give the instructions, although defense counsel stated that he would "prefer" they be given. Hicks now contends that the failure to give CALCRIM No. 223, on the definition of direct and circumstantial evidence, and CALCRIM No. 224, on the sufficiency of circumstantial evidence, violated his state and federal due process right to a fair trial. He asserts that the People's case was based substantially on circumstantial evidence, in the form of expert opinions as to his mental condition, and that, without these instructions, the jury was permitted to find him to be an SVP based on circumstantial evidence that did not constitute proof beyond a reasonable doubt and might reasonably have supported a contrary conclusion. Respondent disagrees, as do we.

CALCRIM No. 223 provides:

"Facts may be proved by direct or circumstantial evidence or by a combination of both. *Direct evidence* can prove a fact by itself. For example, if a witness testifies he saw it raining outside before he came into the courthouse, that testimony is direct evidence that it was raining. *Circumstantial evidence* also may be called indirect evidence. Circumstantial evidence does not directly prove the fact to be decided, but is evidence of another fact or group of facts from which you may logically and reasonably conclude the truth of the fact in question. For example, if a witness testifies that he saw someone come inside wearing a raincoat covered with drops of water, that testimony is circumstantial evidence because it may support a conclusion that it was raining outside. [¶] Both direct and circumstantial evidence are acceptable types of evidence to prove or disprove the elements of a charge, including intent and mental state and acts necessary to a conviction, and neither is necessarily more reliable than the other. Neither is entitled to any greater weight than the other. You must decide whether a fact in issue has been proved based on all the evidence."

CALCRIM No. 224 provides:

"Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant [to be an SVP] has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt. [¶] Also, before you may rely on circumstantial evidence to find the defendant [to be an SVP], you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant [meets the SVP criteria]. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to [not meeting SVP criteria], you must accept the one that points to [not meeting the SVP criteria]. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

We are not aware of any authority addressing whether instructions on circumstantial evidence must be given in SVP proceedings. In *Conservatorship of Walker* (1987) 196 Cal.App.3d 1082, the court held that an instruction on circumstantial evidence should be given in a civil proceeding to appoint a conservator for a mentally ill person under the Lanterman-Petris-Short Act (§ 5000 et seq.). The court noted that appointment of a conservator under the act involved a serious deprivation of the liberty rights of the

11.

conservatee and must be supported by proof beyond a reasonable doubt. (*Conservatorship of Walker, supra,* at pp. 1092-1093, 1098.) Commitment under the SVPA also involves a deprivation of liberty and must also be supported by proof beyond a reasonable doubt. (§ 6604.) Given these similarities between the present proceeding and the proceeding involved in *Conservatorship of Walker,* we will assume for purposes of argument that instruction on circumstantial evidence is required in SVPA commitment proceedings if otherwise appropriate.

Circumstantial evidence instructions must be given where the prosecution's case rests substantially on circumstantial evidence, but it should not be given where the evidence relied on is either direct or, if circumstantial, is not equally consistent with a reasonable conclusion of innocence. (*People v. Heishman* (1988) 45 Cal.3d 147, 167; *People v. Wiley* (1976) 18 Cal.3d 162, 174-176.) Thus, the failure to give the instructions is not prejudicial error where the circumstantial evidence points convincingly to the defendant's guilt. (*People v. Heishman, supra,* at p. 167.)

In addition, the instruction is required only when guilt must be inferred from a pattern of incriminating circumstances. Therefore, not all indirect evidence requires the instruction. Specifically, a defendant's extrajudicial admissions are not the type of indirect evidence to which the instruction is applicable. (*People v. Wiley, supra,* 18 Cal.3d at p. 174.)

Here, the People's case rested in substantial part on the opinions of Drs. Murphy and Selby. Expert opinion testimony is often characterized as indirect or circumstantial evidence. (See, e.g., *People v. Gentry* (1968) 257 Cal.App.2d 607, 611; *People v. Di Giacomo* (1961) 193 Cal.App.2d 688, 695; *People v. Goldstein* (1956) 139 Cal.App.2d 146, 154; *People v. Jones* (1954) 42 Cal.2d 219, 222 [proposed testimony of psychiatrist that defendant was not a sexual deviate was indirect evidence].)

But the expert testimony of Drs. Murphy and Selby was not "equally consistent with a reasonable conclusion of innocence" (*People v. Heishman, supra,* 45 Cal.3d at p. 167), so

12.

as to require the giving of circumstantial evidence instruction. The opinions of Drs. Murphy and Selby that some or all of Hicks's prior criminal sexual conduct was predatory, thus rendering it likely that any future conduct would also be predatory, was unrefuted by any countervailing defense expert testimony. Moreover, much of the prosecution's expert testimony was based on Hicks's own extrajudicial statements and admissions.

On this record, the People's reliance on expert testimony to prove their case did not require the giving of CALCRIM Nos. 223 and 224, as the circumstantial evidence was not equally consistent with a finding Hicks was not an SVP. For the same reason, even if it were to assume that the instructions should have been given, the failure to do so was not prejudicial because the circumstantial evidence pointed convincingly to a finding that Hicks was an SVP. (*People v. Heishman, supra,* 45 Cal.3d at p. 167.)

III. SUFFICIENCY OF THE EVIDENCE

Finally, Hicks contends the evidence was insufficient that he had ever committed a predatory offense or that he would likely commit one in the future. He particularly argues the experts applied the wrong legal standard of "predatory" in forming their opinions. We disagree.

In order to establish that a defendant is an SVP, the state had to prove "(1) [the] defendant was convicted of [one or more] separate sexually violent offenses[3]; (2) he had a diagnosable mental disorder that made him a danger to the health or safety to others; (3) his disorder makes it likely he will engage in sexually violent criminal conduct if released; and (4) his sexually violent criminal conduct will be predatory in nature. [Citations.]" (*People*

---

**3** On November 7, 2006, California voters approved Proposition 83, which made substantive changes to the SVPA, effective November 8, 2006, including, as amended, section 6600 which had required that the People prove two separate sexually violent offenses and now requires that the People prove only a sexually violent offense against one or more victims. (§ 6600, subd. (a)(1); Prop. 83, § 24, approved Nov. 7, 2006, eff. Nov. 8, 2006.)

13.

*v. Fulcher* (2006) 136 Cal.App.4th 41, 52, italics omitted.) "[B]efore a defendant can be committed or recommitted under the [SVPA], the trier of fact must find, beyond a reasonable doubt, that the defendant is likely to commit sexually violent predatory behavior upon release." (*People v. Hurtado, supra,* 28 Cal.4th at p. 1182, italics omitted.) "'Predatory' means an act is directed toward a stranger, a person of casual acquaintance with whom no substantial relationship exists, or an individual with whom a relationship has been established or promoted for the primary purpose of victimization." (§ 6600, subd. (e).)

> "When a defendant challenges the sufficiency of the evidence to support a finding that he is an SVP, 'this court must review the entire record in the light most favorable to the judgment to determine whether substantial evidence supports the determination below. [Citation.] To be substantial, the evidence must be "'of ponderable legal significance … reasonable in nature, credible and of solid value.'" [Citation.]' (*People v. Mercer* (1999) 70 Cal.App.4th 463, 466.) 'In reviewing the record to determine the sufficiency of the evidence this court may not redetermine the credibility of witnesses, nor reweigh any of the evidence, and must draw all reasonable inferences, and resolve all conflicts, in favor of the judgment.' (*People v. Poe* (1999) 74 Cal.App.4th 826, 830.)" (*People v. Sumahit* (2005) 128 Cal.App.4th 347, 352.)

Both Dr. Murphy and Dr. Selby testified that Hicks was likely to reoffend in a sexually violent predatory manner, based on his history of prior predatory offenses and current mental disorder of pedophelia. Dr. Murphy testified that she first reviewed Hicks's criminal history and mental health records and then conducted an interview with Hicks at Corcoran State Prison in June of 2011. Dr. Murphy described Hicks as "forthcoming" during the interview.

Dr. Murphy determined that Hicks had two qualifying offenses, both resulting in convictions for violating Penal Code section 288, subdivision (a), committing a lewd or lascivious act on a child under the age of 14. The first offense occurred in 1990 and involved fondling, orally copulating, and sodomizing a five-year-old male cousin. The second offense occurred in 1999 and involved fondling, orally copulating, and digitally

14.

penetrating the vagina of a three-year-old female cousin. Hicks admitted to police that he molested this victim "seven or eight times."

Dr. Murphy correctly defined a predatory sexual offense as "a crime perpetrated against someone who is either a stranger or someone against whom they cultivated or promoted a relationship with." Dr. Murphy opined that the 1990 and 1999 qualifying offenses were probably not predatory in the strict or legal sense because the victims were his cousins, although she did conclude there was "a predatory element" to those offenses because Hicks likely took advantage of the opportunity to gain access to each of them by babysitting.

Dr. Murphy concluded that Hicks's 1996 offense, for which he was convicted of violating Penal Code section 647.6, annoying and/or molesting a child, was "clearly" predatory. That offense involved the 11-year-old son of a friend with whom Hicks spent "a lot of time" "cultivating" a relationship by taking the victim camping or rafting and then asking him to orally copulate Hicks. Dr. Murphy also concluded that Hicks's recent parole violation, based upon a workplace event in which he "grabbed at the crotch" of a "youthful [looking] male" coworker, was also likely predatory because Hicks had no substantial relationship with the coworker and there was no convincing evidence that the relationship was "potentially romantic." Dr. Murphy opined that the conduct indicated "extremely poor judgment and poor impulse control," given that Hicks was "a three-time convicted sex offender" on parole.

Dr. Murphy diagnosed Hicks as having a mental disorder, specifically pedophilia, or sexual attraction to pre-pubescent children, that predisposed him to committing criminal sexual acts. She also diagnosed him with "[a]mphetamine dependence" that "was controlled in prison," a "cannabis dependence," and a "personality disorder."

Dr. Murphy opined that Hicks was "'[l]ikely to engage in sexually violent predatory criminal behavior as a result of his … diagnosed mental disorder without appropriate treatment and custody,'" which required a "reasonable degree of clinical certainty." In

15.

forming her opinion, Dr. Murphy relied on the "Static-99R" and "Static-2002R," which are "risk assessment tools." Hicks had a score of "four" on the Static-99R, which was "in the moderate to high range," or equated to a 20 to 29.6 percent risk of reoffense. Hicks had a score of "seven" on the Statis-2002R, "also in the moderate high risk range."

Dr. Murphy considered the "Wellness and Recovery Action Plan" (WRAP), or "relapse prevention plan," prepared by Hicks. She was concerned about Hicks's claim that his pedophilia "'ha[d] been in remission since May of 2010,'" because pedophilia was not a disorder that "traditionally goes into remission," but rather requires that one be "constantly vigilant in self-monitoring." Dr. Murphy found Hicks's WRAP had "no actual relapse prevention plan" that included avoiding children. Thus, the WRAP did not change her opinion about Hicks's risk of reoffense. Dr. Murphy opined there was a sex offender treatment program at Coalinga State Hospital that might allow Hicks to reduce his risk of reoffense, but she did not know if such a program was available to him "in the community."

Dr. Selby, who also testified as an expert for the prosecution, evaluated Hicks in June of 2011 at the substance abuse treatment facility in Corcoran. He also reviewed Hicks's criminal records prior to the interview. During the interview, Hicks "cooperated" and was "able to respond to all questions in a clear manner."

Dr. Selby related that Hicks's first qualifying offense, a 1990 conviction of Penal Code section 288, subdivision (a), involved a sexual act on a young male cousin and that the molestations had gone on for several years. Hicks had attempted suicide, been hospitalized, and gone into a group home before resuming the molestations and getting "caught," because he was "unable to control his sexual urges." For this crime, Hicks received probation, some jail time, and was required to attend sex offender treatment for three years.

Hicks told Dr. Selby that the 1999 conviction involved fondling the genital area of a young niece, orally copulating her, exposing his penis to her, and ejaculating in front of her. Other documents indicated that Hicks had molested the girl seven or eight times, that he digitally penetrated her, and that he had her hold his penis. Dr. Selby opined that Hicks

minimized his conduct and failed to take complete responsibility for it. For this crime, Hicks received a prison sentence, was found to be a mentally disordered offender and was at Atascadero State Hospital for six months of "treatment," which probably did not include treatment as a pedophile.

Hicks told Dr. Selby that his 1996 conviction for annoying/molesting a child involved an 11-year-old boy who was a close friend's son. Hicks asked that the boy orally copulate him. Hicks's most recent sexual offense in January of 2011, a violation of parole, involved repeatedly grabbing the genital area of one of his coworkers. Hicks denied being the aggressor and claimed instead to be the victim.

Dr. Selby defined predatory as looking to see whether the perpetrator had "any kind of substantial relationship with the victim other than sexual … or that the person is committing the offense specifically for the purpose of molesting someone." Dr. Selby opined that Hicks did not have a substantial relationship with any of the victims other than sexual. Dr. Selby noted that the very young victim of the 1990 offense was still being potty trained "and having a substantial relationship with that individual … seems virtually impossible." The victim in the 1999 offense was also "very very young" and there was "no indication" of a substantial relationship, despite the fact that the victim was "a cousin [or] niece." Dr. Selby defined the crimes as predatory because the acting out sexually was "the only relationship they have with the individual."

Dr. Selby defined the 1996 molest offense as predatory because he had no idea whether Hicks had known the boy for years and befriended him. If he had had such a "bond[ed]" relationship, Dr. Selby would describe the crime as "[l]ess predatory," although such a perpetrator might be "grooming" the victim for molestation. Dr. Selby described the parole violation as predatory behavior "in the sense that there appeared to be no significant relationship between the victim and Mr. Hicks, that they were coworkers." The fact that the last victim was an adult did not change Dr. Selby's mind because a photograph of the victim showed him to be "a very very young adult" who looked like a minor, under the age of 18.

17.

Dr. Selby diagnosed Hicks with "pedophilia, both sexes, nonexclusive," meaning he had "recurrent sexually-arousing fantasies, urges, or behavior associated with a prepubescent child," or a child 13 years of age or younger, occurring for at least six months, that affects Hicks's "volitional control" and predisposes him to commit sexual crimes. Hicks's lack of volitional control was evident by the fact that he had been "punished" and "treated" and continued to commit sexual crimes. Hicks denied to Dr. Selby that he was sexually attracted to children, claiming he had "'just made bad choices.'" Dr. Selby also diagnosed Hicks with "polysubstance dependence" based upon his methamphetamine and alcohol abuse.

Dr. Selby opined that, due to Hicks's diagnosed mental disorder, he was "likely to commit another sexually violent predatory offense without treatment in a custodial setting." Dr. Selby defined "likely" as a "serious and well-founded risk." While Hicks received three years of sex offender treatment after his 1990 crime, he was convicted of additional sexual offenses in 1996 and 1999. And while Hicks received treatment at Atascadero after the 1999 crime, once on parole, he against chose to "act out sexually," which showed that a "lack of volitional control" was "still present."

Dr. Selby testified that, in the WRAP prepared by Hicks, he finally acknowledged that he was a pedophile, but he did not indicate that he would seek further sex offender treatment in the community. Instead, he would seek "support from people that he knew in the community" and would try to avoid children. Hicks told Dr. Selby that he would "hopefully live with an inmate once the inmate got out of prison," which Dr. Selby did not think was a good plan.

Dr. Selby used the risk factors set forth in the Static-99R, Static-2002, and other such "tools," but did not use the "total scores" from those tools because they did not "address the issue of mental illness at all." Dr. Selby opined that Hicks was still in need of "highly structured" sex offender and substance abuse treatment in a custodial setting for "at least two to three years," such as the treatment available to Sexually Violent Predators at

18.

Coalinga State Hospital. Absent such treatment, there was still a "serious and well-founded risk" that Hicks would reoffend.

We believe the state's evidence allowed the jury to conclude, beyond a reasonable doubt, that Hicks's previous violent offenses, his mental disorder, and the resulting serious lack of control, led to the likelihood Hicks would engage in future sexually predatory acts if not confined to a secure facility.

### DISPOSITION

The judgment is affirmed.


_____

Franson, J.

WE CONCUR:


_____

Poochigian, Acting P.J.


_____

Detjen, J.