Filed 9/18/19 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| Conservatorship of the Person and Estate of K.P.<br><br>PUBLIC GUARDIAN OF THE COUNTY OF LOS ANGELES,<br><br>Petitioner and Respondent,<br><br>v.<br><br>K.P.,<br><br>Objector and Appellant. | B291510<br><br>(Los Angeles County<br>Super. Ct. No. ZE032603)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed August 28, 2019, be modified as follows:

1. On page 17, in the first sentence of the first full paragraph, the word "analyzed" is changed to "discussed" so the sentence reads:

> In so finding, the *Davis* court discussed section 5352, which provides that when a professional "determines that a person in his or her care is gravely disabled . . . and is unwilling to accept, or incapable of accepting, treatment voluntarily, he or she may recommend conservatorship to the officer providing conservatorship investigation . . . prior to his or her admission as a patient in such facility."

2.  On page 19, in the second sentence of the last full paragraph, the words "or reestablish" are inserted between the words "establish" and "a" so that the sentence reads:

> Section 5352, which allows a professional to initiate conservatorship proceedings for a patient that is unwilling to accept treatment, does not add an additional requirement, to be proved beyond a reasonable doubt, to establish or reestablish a conservatorship.

3.  On page 20, the first full paragraph is deleted and the following paragraph is inserted in its place:

> Thus, we find that the trial court did not err in declining to include the element of unwillingness or inability to accept treatment as part of the definition of "gravely disabled" in CACI No. 4000.

There is no change in the judgment.

Appellant's petition for rehearing is denied.

_____

LUI, P. J.                ASHMANN-GERST, J.                CHAVEZ, J.

2

Filed 8/28/19 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| Conservatorship of the Person and Estate of K.P. <br><br> PUBLIC GUARDIAN OF THE COUNTY OF LOS ANGELES, <br><br> Petitioner and Respondent, <br><br> v. <br><br> K.P., <br><br> Objector and Appellant. | B291510 <br><br> (Los Angeles County Super. Ct. No. ZE032603) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Robert Harrison, Judge. Affirmed.

Christian C. Buckley, under appointment by the Court of Appeal, for Objector and Appellant.

Office of the County Counsel, Mary C. Wickham, County Counsel, Rosanne Wong, Assistant County Counsel, and William C. Sias, Deputy County Counsel, for Petitioner and Respondent.

Conservatee K.P. (K.P.) appeals from a judgment entered following a jury trial on the petition by the Public Guardian of the County of Los Angeles (public guardian) for reappointment as K.P.'s conservator under the Lanterman-Petris-Short Act (LPSA) (Welf. & Inst. Code § 5000 et seq.).[1]  After a three-day trial, the jury found that K.P. was gravely disabled pursuant to the LPSA, and the trial court granted the public guardian's petition for reappointment.  K.P. argues that the court erred in instructing the jury pursuant to California Civil Jury Instruction (CACI) No. 4000, which sets forth the elements of a claim that an individual is gravely disabled.  Specifically, K.P. contends that the trial court erred in omitting a third element from CACI No. 4000, which required a finding that the individual "is unwilling or unable voluntarily to accept meaningful treatment."  We find no reversible error and affirm the judgment.

**BACKGROUND**

**The LPSA**

"The [LPSA] governs the involuntary detention, evaluation, and treatment of persons who, as a result of mental disorder, are dangerous or gravely disabled.  (§ 5150 et seq.)"  (*Conservatorship of John L.* (2010) 48 Cal.4th 131, 142 (*John L.*).)  Under the LPSA, the court may "appoint a conservator of the person for one who is determined to be gravely disabled (§ 5350 et seq.), so that he or she may receive individualized treatment, supervision, and placement (§ 5350.1)."  (*John L.*, at p. 142.)  The LPSA defines a person who is "gravely disabled" as one who is "unable to provide for his or her basic personal needs for food, clothing, or shelter." (§ 5008, subd. (h)(1)(A).)

---

[1]     All further statutory references are to the Welfare & Institutions Code unless otherwise noted.

"An LPSA conservatorship automatically terminates after one year, and reappointment of the conservator must be sought by petition. (§ 5361.)" (*John L., supra*, 48 Cal.4th at p. 143.)[2]

**Conservatorship reappointment pretrial proceedings**

On April 19, 2018, the public guardian filed a petition for reappointment as conservator of K.P. under sections 5350 through 5368. On May 5, 2018, K.P. filed a demand for jury trial.

At the trial readiness conference on June 14, 2018, the public guardian filed a memorandum dated June 12, 2018, containing information from Dr. Sara Mehraban, Program Coordinator at Gateways Satellite, where K.P. was being treated. Dr. Mehraban observed that recently K.P. had become paranoid. In May 2018, he was sitting outside and was accidentally "grazed" by a basketball. He then charged a fellow resident who he attempted to stab with a pen because K.P. believed the other individual had intended to hit him with the basketball. K.P. continued to try to attack the other resident even with staff intervention, and had to be hospitalized because he would not let go of the situation and still wanted to attack the other resident later in the day.

Dr. Mehraban reported that K.P.'s mother was of the view that K.P. does not have a mental illness. K.P.'s mother also

_____

[2] We note that the reappointment at issue terminated on June 3, 2019. Because the conservatorship from which K.P. appeals has terminated, this appeal is technically moot. (*Conservatorship of David L.* (2008) 164 Cal.App.4th 701, 709.) However, because a conservatorship is brief in comparison with the appellate process, this issue is one that is "'capable of recurring, yet of evading review because of mootness.'" (*Ibid.*) We therefore conclude it is appropriate to address the issue in this case.

3

believed that K.P.'s medications were making him act as he did, and she did not believe that the recent reported incident of aggression took place. Dr. Mehraban thought mother's visits were negatively affecting K.P. and intended to revoke them until K.P. improved. Dr. Mehraban was aware of the upcoming trial and wanted the court to be aware of this information.

**Trial**

A three-day jury trial commenced on June 20, 2018. K.P. appeared with his counsel.

### *Preliminary matters*

Prior to trial the court addressed the ground rules for trial, emphasizing the need to focus the jurors on the question of whether K.P. was gravely disabled. The court asked counsel not to talk about the length of, or results of, a conservatorship. K.P.'s counsel argued that the jury should be made aware of the length of the conservatorship and that forced medication could be administered against a person's will. The court said counsel should remain within the framework of CACI No. 4000. K.P.'s counsel objected to the instruction. The court ordered K.P.'s counsel not to refer to the time limits of a conservatorship.

K.P.'s counsel then addressed CACI No. 4000, by arguing, "there was a time where for decades we would have that element three." K.P.'s counsel conceded that the third element had dropped out of consistent use in CACI No. 4000. However, he advocated for its inclusion here because he intended to show that K.P. was "willing to voluntarily accept treatment." K.P.'s counsel acknowledged that there had been a "so-called 'Missouri Compromise'" where the element of willingness and ability to voluntarily accept meaningful treatment had been added to CACI No. 4002, in the very last sentence. K.P.'s counsel argued that

4

this was insufficient because it was "thrown in at the bottom of some other less consequential later jury instruction."

The court observed that case law indicated that the version of CACI No. 4000 the court would provide, properly laid out the elements that the public guardian needed to prove in order to show that an individual was gravely disabled. However, the jury should be able to consider willing, voluntary acceptance of treatment, therefore it was included in CACI No. 4002.

### *Opening arguments*

The parties provided their respective opening statements to the jury. The public guardian said it would prove, beyond a reasonable doubt, that K.P. had a mental disorder, and that as a result of that disorder, K.P. was gravely disabled.

K.P.'s counsel outlined the evidence that he would provide to show that K.P. was not gravely disabled. Counsel argued, "If anything, the evidence will show that he has a plan to take care of himself." Counsel stated:

> "So just keep in mind when you're hearing all this evidence, and then, ultimately, you deliberate, it's the county that's got to convince you beyond a reasonable doubt that he's gravely disabled which means, look, if he's off conservatorship, he won't have a stable place to stay; that he can't take care of his basic food, clothing, or shelter and because it's going to be an issue here, there is no viable alternative. By 'alternative' meaning, look, what his family is able to do to help him out, it's not enough. He's still gravely disabled. So they have that extra burden here of showing there is no third-party assistance to help him out and that, ultimately, he's unwilling to seek treatment."

5

K.P.'s counsel finished with "If anything, the evidence shows he's willing to continue with his treatment."

### *Trial testimony*

#### **K.P.'s mother**

K.P.'s counsel called Karen Celestine (mother), K.P.'s mother.[3] On direct examination, mother testified that she believed her son had a mental illness; that she was willing to help him see a psychiatrist and help him fill prescriptions; that she believed he needed to continue taking his medications; and that she would insist that he take his medications if he resisted taking them.

Mother could not provide housing for K.P. However, she would help him find an apartment or board and care. She agreed to take him to a mental hospital if his symptoms returned or he was resisting taking his medications.

On cross-examination, mother was asked about her immediate plan for finding K.P. housing if he were to win his jury trial. Mother indicated that she "would find housing," by "looking for him and going to talk to the people and . . . getting quotes and stuff." When asked where K.P. would be staying during the "interim" period while she looked for housing, she responded, "Well, he's at the facility right now. So I don't know how that works." K.P.'s medical doctor was still in place, and for his psychiatric and mental health issues, she testified "They refer him. He has referrals." On redirect, mother indicated that she would work with K.P.'s current social worker on discharge

_____

[3]     The court had been advised, outside of the presence of the jury, that mother was starting a new job the following day and would not be available to return to court and testify. The court agreed that the witnesses would be called out of order.

planning.  She typically worked during the week and visited K.P. on the weekends.

### Dr. Sara Mehraban

Dr. Mehraban, the licensed clinical psychologist employed by the residential agency where K.P. was residing, was called by the public guardian to offer her expert opinion.  She normally saw K.P. five days a week for nearly eight hours a day.  She met with him individually and in groups.

Dr. Mehraban's most recent examination of K.P. had been earlier that morning at the facility.  Dr. Mehraban testified that K.P. had been diagnosed with schizophrenia.  As a result of this disorder, K.P. experienced auditory hallucinations.  During auditory hallucinations, he believes he is hearing voices, and responds to them.  In addition, K.P. suffered from delusions, which are false beliefs that are in contradiction to reality.  The false beliefs are considered bizarre.  Dr. Mehraban testified that K.P.'s delusions tended to be paranoid, where he believed people were out to get him and people were out to hurt him.  K.P. was often scared of people hurting him.

K.P. had experienced some delusions that morning.  He requested to be in the witness protection program because he believed that a peer who had been standing near him was trying to attack him.  K.P. expressed a desire to enter the witness protection program because he was afraid of that peer.

In addition to the above described symptoms of auditory hallucinations and delusions, K.P. also experienced symptoms of schizophrenia, such as not being motivated, not being able to socialize with other people, difficulty speaking, and poverty of speech.

Dr. Mehraban described the recent incident which resulted in K.P.'s hospitalization. She explained that K.P. believed he had been intentionally hit with a basketball, pursued an individual with a pen and was unable to be redirected. Dr. Mehraban explained that K.P.'s paranoia and fear could be so extreme that it caused him to act in ways that K.P. believes are self-defense, but which are not appropriate.

Dr. Mehraban informed the jury of the medications that K.P. takes for schizophrenia and heightened anxiety. She also explained her conversation about the medications with K.P., in which he had been inconsistent about his willingness to continue if he were to be released from the conservatorship. Dr. Mehraban was of the opinion that K.P. was not capable of providing for his basic food, shelter, and clothing without taking the medication. Nor did she expect he would continue taking the medication without the supervision of a conservator.

Dr. Mehraban explained "insight" as it relates to a mentally ill person. K.P. had the basic level of insight, meaning that he had some understanding that he had symptoms, however, he "minimizes them and doesn't really understand where they come from." K.P. had suggested at times the symptoms came from his medications, and that the medications were causing the symptoms.[4] The highest level of insight would be the ability of an individual to effectively manage his or her symptoms, and K.P. did not meet that level. K.P. had declined to take his medications when he was not feeling well, even though he had

_____

[4]    K.P.'s mother had also expressed to Dr. Mehraban that she believed K.P.'s medications were causing his hallucinations.

been told that taking his medication was "the most important thing" even when he did not feel well.

Dr. Mehraban had discussed with K.P. his plans if he were to be released from his conservatorship. He told her that he wanted to live in an apartment, and that his mother would help him. To Dr. Mehraban's knowledge, K.P. had not been to look at any apartments. Dr. Mehraban did not believe that K.P. had a viable plan for self-care. In the year and a half that he resided at the facility, he had never gone into the community without his mother or his therapist, despite having the opportunity. Dr. Mehraban was concerned that K.P. would not have anyone for support, and in her opinion, at this time, he needed constant supervision. K.P.'s mother had not spoken to Dr. Mehraban about K.P.'s plans if he were to be released from conservatorship.

Dr. Mehraban was of the opinion that K.P. did not have sufficient insight to be a voluntary patient, which would involve making appointments, getting to appointments, and calling the pharmacy. K.P. had not demonstrated a capacity to manage these tasks. He had expressed to Dr. Mehraban that he wanted to get off his medications, and then tended to waffle between wanting to be on the medications and not wanting to take them. Dr. Mehraban found this concerning given the importance of the medications.

On cross-examination Dr. Mehraban agreed that it is important for a patient to acquire insight regarding medication. There is no cure for schizophrenia, but the symptoms can be controlled through treatment. Dr. Mehraban believed that K.P. was presently telling her he would take his medications because he would have a secondary gain. She did not believe that he had insight into his medications. About a month earlier Dr.

Mehraban asked K.P. whether he would follow up with treatment if released.  K.P. responded that he would think about it.

On re-direct examination, Dr. Mehraban related an incident with K.P.'s medication from the previous day.  Dr. Mehraban gave K.P. his medication before he went to court.  The patients are handed their pack of medications, and they are supposed to know what day it is and how to administer the medication.  Dr. Mehraban was monitoring K.P., and he almost gave himself a double dose of one of his medications that can cause toxicity.  When Dr. Mehraban stopped him and told him that he had already taken it, K.P. disagreed.

### K.P.

K.P. was asked whether he was willing to stay at his current placement until he and his mother could find a place for him.  He responded, "no."  When asked the same question a second time, he responded, "yes."

K.P.'s counsel asked him, "If you get out of the hospital, are you willing to continue to take psychiatric medications?"  K.P. responded, "No."  K.P.'s counsel again asked him, "You don't want to take medications?"  K.P. responded, "No."  K.P. acknowledged that he needed a psychiatrist.  When asked if he thought he had a mental illness, he responded, "No."  When asked if he had schizophrenia, K.P. responded, "No."  When asked if he wanted to continue taking "psych medications," K.P. responded, "I feel like I'm doing better without them."  When asked a second time, K.P. provided the same answer.

On cross-examination, K.P. was asked about the incident involving the basketball.  He described it as an "attack."  He admitted that he became "outraged."  K.P. repeated that he did not believe he should take medication anymore.  "I'm at a point

10

where I've taken them enough -- where I feel like I've taken them enough that I need to stop." K.P. did not believe that he had schizophrenia, but that he experienced brain trauma as a child. K.P. received $800 every month in social security benefits but nothing else. He indicated that upon his release he intended to become a businessman. When asked about his previous experience, K.P. stated that he sold candy in 1995.

When K.P. was asked about his mother, he indicated that she was previously his conservator. When asked why that ended, K.P. stated, "I think it's because she moved away, and she was homeless."

### *Jury instructions/closing arguments*

The jury instructions were read but not recorded. The court gave the following relevant instructions:

**"CACI No. 4000. Conservatorship--Essential Factual Elements**

"The Office of the Public Guardian claims that [K.P.] is gravely disabled due to a mental disorder and therefore should be placed in a conservatorship. In a conservatorship, a conservator is appointed to oversee, under the direction of the court, the care of persons who are gravely disabled due to a mental disorder. To succeed on this claim, the Office of the Public Guardian must prove beyond a reasonable doubt all of the following:

"1. That [K.P.] has a mental disorder; and

"2. That [K.P.] is gravely disabled as a result of the mental disorder."

11

**"CACI No. 4002. 'Gravely Disabled' Explained**

"The term 'gravely disabled' means that a person is presently unable to provide for his or her basic needs for food, clothing, or shelter because of a mental disorder.

"Psychosis, bizarre or eccentric behavior, delusions or hallucination are not enough, by themselves, to find that [K.P.] is gravely disabled. He must be unable to provide for the basic needs of food, clothing, or shelter because of a mental disorder.

"If you find [K.P.] will not take his prescribed medication without supervision and that a mental disorder makes him unable to provide for his basic needs for food, clothing, or shelter without such medication, then you may conclude [K.P.] is presently gravely disabled.

"In determining whether [K.P.] is presently gravely disabled, you may consider evidence that he did not take prescribed medication in the past. You may also consider evidence of his lack of insight into his mental condition.

"In determining whether [K.P.] is presently gravely disabled, you may not consider the likelihood of future deterioration or relapse of a condition.

"In determining whether [K.P.] is presently gravely disabled, you may consider whether he is unable or unwilling voluntarily to accept meaningful treatment."

**"CACI No. 4007. Third Party Assistance**

"A person is not 'gravely disabled' if he can survive safely with the help of third party assistance. Third party assistance is the aid of family, friends, or others who are responsible, willing, and able to help provide for the person's basic needs for food, clothing, or shelter.

"You must not consider offers by family, friends, or others unless they have testified to or stated specifically in writing their willingness and ability to help provide [K.P.] with food, clothing, or shelter. Well-intended offers of assistance are not sufficient unless they will ensure the person can survive safely."

In closing argument, counsel for the public guardian reminded the jurors that he had identified three factors that he would prove beyond a reasonable doubt: first, that K.P. suffers from a mental disorder; second, that as a result of the mental disorder, K.P. cannot provide for his basic needs of food, shelter, and clothing; and finally, that there were no reasonable viable alternatives to conservatorship for K.P. He added that the public guardian had shown that K.P. lacked sufficient insight into his mental disorder, and would not continue to take his prescribed medications unless he was under a conservatorship. Counsel then discussed the relevant evidence supporting the position that these factors had been proven beyond a reasonable doubt.

In his closing argument, K.P.'s counsel argued that the "third-party assistance" instruction was an important one. He asked that the jury consider whether K.P. is gravely disabled given that he could survive with the help of a third party. K.P.'s counsel also pointed out instruction CACI No. 4002, specifically

13

the language indicating that the jury may consider whether he is unable or unwilling voluntarily to accept meaningful treatment. Counsel stated, "currently, he is taking his medication. He is in his treatment. He does have his mother to assist him if he gets out so that he can take his medications, follow up with the doctors." Counsel argued that K.P. was able to accept meaningful treatment.

### *Verdict*

On June 22, 2018, the jury found that K.P. was gravely disabled. The court reappointed the public guardian as conservator of K.P.'s person and estate.

## Appeal

On July 5, 2018, K.P. filed his notice of appeal.

## DISCUSSION

K.P. contends that the trial court erred by omitting a third element from the CACI No. 4000 instruction provided to the jury. We find no error. We further find that even if instructional error had occurred, any such error would be harmless under the circumstances of this case.

## I. Standard of review

LPSA proceedings are civil in nature, but individuals subject to conservatorship proceedings are entitled to certain due process protections similar to a criminal defendant because significant liberty interests are at stake. (*Conservatorship of P.D.* (2018) 21 Cal.App.5th 1163, 1166-1167 (*P.D.*).)

We review the propriety of the jury instructions de novo. (*Caldera v. Department of Corrections & Rehabilitation* (2018) 25 Cal.App.5th 31, 44-45; *P.D., supra*, 21 Cal.App.5th at p. 1167.) "In considering the accuracy or completeness of a jury

14

instruction, we evaluate it in the context of all of the court's instructions. [Citation.]" (*Caldera*, at p. 45.)

## II. The instruction was not error

K.P. contends that the trial court failed to properly instruct the jury with a third element in CACI No. 4000, which would have required the jury to find, beyond a reasonable doubt, that K.P. was "unwilling or unable voluntarily to accept meaningful treatment."[5] The parties have cited and discussed the relevant case law. Our review of the relevant cases leads us to the conclusion that the trial court's instruction was not erroneous.

K.P. points out that the use note to CACI No. 4000 states:

"There is a split of authority as to whether element 3 is required. (Compare *Conservatorship of Symington* (1989) 209 Cal.App.3d 1464, 1467 ['[Many gravely disabled individuals are simply beyond treatment'] with *Conservatorship of Davis* (1981) 124 Cal.App.3d 313, 328 [jury should be allowed to consider all factors that bear on whether person should be on LPS conservatorship, including willingness to accept treatment].)"

(Use Note to CACI No. 4000 (Rev. 2006) (2019) p. 964.)

_____

[5] The two elements that the trial court included in the instruction were "1. That [K.P.] [has a mental disorder/is impaired by chronic alcoholism]; [and] [¶] 2. That [K.P.] is gravely disabled as a result of the [mental disorder/chronic alcoholism]." (CACI No. 4000.) The third element, which K.P. argues should have been included, is: "[3. That [K.P.] is unwilling or unable voluntarily to accept meaningful treatment.]" (*Ibid.*)

15

K.P. argues that this statement is incorrect, and there is no split of authority. On the contrary, K.P. argues, the law supports his position that, where there is evidence that the conservatee is willing and able to voluntarily accept meaningful treatment, the court must give the third element of CACI No. 4000. In making this argument, K.P. relies primarily on *Conservatorship of Davis* (1981) 124 Cal.App.3d 313 (*Davis*).

First, we note that *Davis* is distinguishable in that it involved a petition to establish a conservatorship, not a petition for reappointment. (*Davis, supra*, 124 Cal.App.3d at p. 317.) The petition had been filed as to a 39-year-old woman, who had been married for 18 years. Her husband testified at the trial that he was willing to have respondent live at his home and she would be welcome at their family home if she returned to it. (*Ibid.*) The woman testified to the jury that she would continue taking her medication as long as the doctor felt it was necessary. She also testified to her personal habits of self-care, cooking, and grocery shopping. (*Id.* at p. 319.)

The jury was instructed, over the public guardian's objection, that "'[B]efore you may consider whether Mary Davis is gravely disabled you must first find that she is, as a result of a mental disorder, unwilling or unable to accept treatment for that mental disorder on a voluntary basis. If you find that Mary Davis is capable of understanding her need for treatment for any mental disorder she may have and capable of making a meaningful commitment to a plan of treatment of that disorder she is entitled to a verdict of 'not gravely disabled.'" (*Davis, supra,* 124 Cal.App.3d at p. 319.) The jury found her not gravely disabled. (*Id.* at p. 317.) The public guardian appealed, arguing that the trial court erred in delivering this instruction. The

16

Court of Appeal disagreed, finding no prejudicial error. (*Id.* at pp. 329, 331.)

In so finding, the *Davis* court analyzed section 5352, which provides that when a professional "determines that a person in his or her care is gravely disabled . . . and is unwilling to accept, or incapable of accepting, treatment voluntarily, he or she may recommend conservatorship to the officer providing conservatorship investigation . . . prior to his or her admission as a patient in such facility." Section 5352 is not at issue in the present appeal, as the petition here is not a petition to establish a conservatorship. Nor is a conservatorship investigation at issue. Instead, this was a petition for reappointment.[6] Thus, we find *Davis* unpersuasive here.

*Conservatorship of Early* (*Early*) (1983) 35 Cal.3d 244, is also distinguishable. *Early,* like *Davis,* involved an initial conservatorship proceeding, not a reappointment. The primary issue was whether the conservatee should have been permitted to introduce evidence that he could meet his needs for food, clothing,

_____

[6]     K.P. was subject to a reappointment petition pursuant to section 5361, which provides that "[i]f upon the termination of an initial or a succeeding period of conservatorship the conservator determines that conservatorship is still required, he may petition the superior court for his reappointment as conservator for a succeeding one-year period." Section 5361 requires an opinion by two licensed professionals that "the conservatee is still gravely disabled as a result of a mental disorder." (§ 5361; see also *Conservatorship of Dierdre B.* (2010) 180 Cal.App.4th 1306, 1312 [reestablishment of conservatorship requires state "to prove beyond a reasonable doubt that the conservatee *remains* gravely disabled" (italics added)].) Thus, section 5352 would not apply in this context.

17

and shelter with the assistance of family and friends.  (*Early*, at p. 249.)  No particular jury instructions were analyzed, although the conservatee also appealed the "failure to instruct that a person is not gravely disabled if he can meet his basic needs with the assistance of others."  (*Id.* at p. 248.)  The *Early* court did not weigh in on the necessity of including such language in the instruction setting out the essential factual elements of a conservatorship.  It merely held, in general, that "a jury is entitled to consider the availability of third party assistance to meet a proposed conservatee's basic needs for food, clothing and shelter."  (*Id.* at p. 247.)  Such consideration was appropriately made here, with the court permitting evidence, and providing instruction, on third party assistance.  In addition, the court explicitly instructed the jury, in CACI No. 4002, that in contemplating the term "gravely disabled," the jury could consider the element of willingness and ability to voluntarily accept meaningful treatment.  Thus, *Early* does not support the claim of instructional error in this case.

*Conservatorship of Walker* (1987) 196 Cal.App.3d 1082 (*Walker*), involved an erroneous instruction that advised a jury that conservatorship was inappropriate only if the potential conservatee "can provide for his needs *and* is willing to accept treatment."  (*Id.* at p. 1092, fn. omitted.)  This instruction was error because "if persons provide for their basic personal needs (i.e. are not gravely disabled) *or* are able to voluntarily accept treatment, there is no need for a conservatorship."  (*Ibid.*)  The *Walker* court found the instructional error harmless beyond a reasonable doubt because the conservatee "admitted he would not take medication on his own."  Thus, "as a matter of law no jury could find [the conservatee], on his own or with family help,

18

capable of meeting his basic needs for food, clothing or shelter." (*Id.* at p. 1094.)

We find the analysis in *Conservatorship of Symington* (1989) 209 Cal.App.3d 1464 (*Symington*), relied upon by the public guardian, to be persuasive. In *Symington,* the conservatee argued that reversal of the finding of grave disability was required due to the trial court's failure to make a finding that the conservatee was unwilling or unable to voluntarily accept treatment for her mental illness. (*Id.* at p. 1467.) The *Symington* court held that "gravely disabled," as defined in section 5008, subdivision (h)(1) is a "'condition in which a person, as a result of a mental disorder, is unable to provide for his basic personal needs for food, clothing, or shelter[.]'" (*Symington*, at p. 1468.) The court noted that this definition makes no mention of a conservatee's refusal or inability to consent to treatment, and that the language concerning a proposed conservatee's refusal or inability to consent to treatment appeared only in section 5352. (*Symington*, at pp. 1467-1468.) The court determined that section 5352 was enacted to allow treatment facilities to initiate conservatorship proceedings at the time of admitting a patient when the patient may be uncooperative. (*Symington*, at p. 1467.) The section was not enacted "as an additional element to be proved to establish the conservatorship itself." (*Ibid.*)

We agree with *Symington.* Section 5352, which allows a professional to initiate conservatorship proceedings for a patient that is unwilling to accept treatment, does not add an additional requirement, to be proved beyond a reasonable doubt, to establish a conservatorship.

19

Thus, we find that the trial court did not err in instructing the jury as to the definition of "gravely disabled" in CACI No. 4000.

## III. Any error would be harmless

We further find that, even if the trial court had committed error in its instructions to the jury, any error would be harmless as a matter of law in this case because the evidence was overwhelming that K.P. was unwilling or unable to accept treatment.  Specifically, K.P. testified that he did not have a diagnosed mental disability and did not intend to continue taking his medications if he were released because he believed he was better off without them.  Thus, K.P. admitted that he was unwilling or unable to accept appropriate treatment.

The parties point to differing authorities regarding the standard of prejudice applicable to the instructional error at issue.  The public guardian advocates for the civil standard, which requires that, to be reversible, any error must result in a miscarriage of justice.  (*Adams v. MHC Colony Park, L.P.* (2014) 224 Cal.App.4th 601, 613.)[7]  In support of the use of this standard, the public guardian cites *Conservatorship of George H.*

_____

[7]     Article VI, section 13 of the California Constitution provides that "[n]o judgment shall be set aside, or a new trial granted, in any cause, on the ground of misdirection of the jury . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."  This prohibits reversal unless there is "a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached.  [Citation.]"  (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574.)

(2008) 169 Cal.App.4th 157, 164-165 ["given that LPS conservatorship proceedings are not criminal proceedings, the sua sponte duty to instruct . . . does not apply to jury trials under section 5350"].)  K.P., on the other hand, advocates for the criminal standard of constitutional error, citing *Early, supra*, 35 Cal.3d 244 at page 255 [holding that error in conservatorship proceeding was "not harmless beyond a reasonable doubt"].[8]

We need not resolve the question of the appropriate standard of prejudice applicable in this matter.  Given K.P.'s admission that he was unwilling to accept meaningful treatment, any purported error was harmless under either standard. (*Walker, supra,* 196 Cal.App.3d at p. 1094 [holding that where conservatee admitted he would not take medication, "as a matter of law no jury could find [the conservatee], on his own or with family help, capable of meeting his basic needs for food, clothing or shelter"].)

---

[8]    The requirement in criminal cases that constitutional error be found harmless beyond a reasonable doubt was set forth in *Chapman v. California* (1967) 386 U.S. 18, 24 ["before a . . . constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt"].)

21

**DISPOSITION**

The judgment is affirmed.

**CERTIFIED FOR PUBLICATION**


_____, J.
CHAVEZ

We concur:


_____, P. J.
LUI


_____, J.
ASHMANN-GERST

22