Filed 10/31/19

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| Conservatorship of the Person and Estate of D.P., | B291525 |
| | (Los Angeles County Super. Ct. No. ZE041308) |
| PUBLIC GUARDIAN OF THE COUNTY OF LOS ANGELES, | |
| Petitioner and Respondent, | |
| v. | |
| D.P., | |
| Objector and Appellant. | |

APPEAL from an order of the Superior Court of the County of Los Angeles, Robert Harrison, Judge.  Affirmed.

---

\*      Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of section II and section III, subsections B and D.

Christopher Lionel Haberman, under appointment by the Court of Appeal, for Objector and Appellant.

No appearance for Petitioner and Respondent.

————————————————

## I. INTRODUCTION

The Public Guardian of the County of Los Angeles (County) filed a petition under the Lanterman-Petris-Short Act (LPS Act) (Welf. & Inst. Code, § 5000 et seq.)[1] for reappointment as the conservator of appellant D.P., alleging that he was gravely disabled as the result of a mental disorder.  Following a trial at which the jury found D.P. to be gravely disabled, the trial court granted the petition and ordered reappointment of the County as D.P.'s conservator.

On appeal from the reappointment order, D.P. contends, among other things, that the trial court committed prejudicial error by failing to instruct the jury on an element necessary to the gravely disabled finding.  In the published portion of this opinion, we hold that the trial court properly instructed the jury using the applicable statutory definition of gravely disabled.  In the unpublished portion this opinion, we address and reject D.P.'s other contentions on appeal.  We therefore affirm the trial court's reappointment order.

---

[1] The LPS Act governs the detention and treatment of persons who are dangerous or gravely disabled as a result of a mental disorder.  All statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

## II.  FACTUAL AND PROCEDURAL BACKGROUND

A.     *Petition for Reappointment of Conservator*

On February 26, 2018, the trial court notified D.P. and the County that the one-year LPS conservatorship established for D.P. under section 5350 would terminate on April 24, 2018.  On March 9, 2018, the County filed a petition for reappointment as the conservator of the person and estate of D.P., setting the initial hearing on the petition for April 3, 2018.  Following various continuances and D.P.'s April 16, 2018, request for jury trial detailed below, the trial court set the matter for jury trial on July 6, 2018.

B.     *Jury Trial*

Jury trial commenced on July 6, 2018, with Dr. Loreta Mulokas testifying for the County and D.P. testifying on his own behalf.

### 1.     Dr. Mulokas's Testimony

Dr. Mulokas, a board certified geriatric psychiatrist, had evaluated patients with mental disorders for 32 years.  She had testified as an expert in court over 100 times.

D.P. was first admitted to Dr. Mulokas's psychiatric unit at the West Los Angeles Veterans Hospital in May 2017.  He was transferred from a medical floor to the "geriatric psych[] ward" due to behavioral issues.

During the past year, as the regular psychiatrist in the unit, Dr. Mulokas saw D.P. on a daily basis during her morning rounds. She also conducted more in-depth evaluations of him every two or three months.

In preparation for her trial testimony, Dr. Mulokas reviewed D.P.'s current psychiatric medical records and consulted with the hospital treatment team involved in his care. Based on her interviews with D.P., her review of his records, and her consultations with his treatment team, Dr. Mulokas opined that he suffered from a mental illness—schizoaffective disorder bipolar type. He initially presented with symptoms of paranoia and hallucinations, but had improved with treatment that included psychiatric medication.

Dr. Mulokas confirmed that D.P.'s schizoaffective diagnosis was consistent with a mental disorder defined in the DSM-5.[2] According to Dr. Mulokas, "[s]chizoaffective disorder diagnostic criteria include psychotic symptoms, which are persistent after mood symptoms are . . . resolved . . . ." In the past, D.P. exhibited "agitated depression with psychotic symptoms," as well as "[paranoia] which led him to hostility, distrust in [his] treatment team[] and in roommates, [and] cause[d] him to become aggressive [and] throw[] things at staff . . . like feces[] and his diapers . . . ."

D.P.'s behavior had improved recently, but he "still engaged in socially inappropriate behavior . . . ." In one recent incident, D.P. "exposed himself inappropriately in the day room . . . [by

_____

[2]    The DSM-5, or the Diagnostic and Statistical Manual for Mental Disorders, 5th Edition, defines and classifies mental disorders for purposes of diagnosis, treatment, and research. (*McGee v. Bartow* (7th Cir. 2010) 593 F.3d 556, 574–575.)

4

taking] off his wetted diaper . . . and [throwing] it on the floor in front of other patients."

D.P.'s currently prescribed psychiatric medications to treat his schizoaffective disorder included: a mood stabilizer, depakote; an antidepressive medication, duloxetine; and another antidepressant, trazodone. At the time of trial, D.P. was compliant in taking his medications and did not require "prompting" to ensure compliance. Although D.P. believed that he did not need medication and did not believe he had a mental illness, he accepted the treatment imposed on him. But, according to Dr. Mulokas, D.P. would still stay in bed all day unless "prompted" to get up and move to the day room.

Dr. Mulokas explained that D.P. did not have "insight into his mental disorder," i.e., he did not, or could not, acknowledge or understand that he suffered from a mental disorder for which he needed treatment. In Dr. Mulokas's opinion, D.P. could not treat his mental illness on his own without assistance and could not "provide for his own basic food, clothing, and shelter [needs] without taking [his] medication." Dr. Mulokas believed D.P. needed to "be treated in [a] secured psychiatric setting with medical privileges . . . because he ha[d] certain medical conditions which [needed] to be closely supervised and treated."[3] To her knowledge, D.P. had not "ever successfully lived independently in the community without supervision." When she discussed with him where he would live if released, he replied, "'If I go to the street, I will find out.'" Although D.P. had supplemental social

---

[3] In addition to his mental disorder, D.P. suffered from serious medical conditions, including diabetes and metastatic prostate cancer.

5

security income, he did not have veterans benefits and could not handle his own finances.

In Dr. Mulokas's opinion, D.P. lacked sufficient insight to be a "meaningfully [voluntary] patient" and he was "currently gravely disabled due to a mental disorder such that he need[ed] to remain in a conservatorship . . . ."

### 2.    D.P.'s Testimony

D.P. believed he had schizophrenia and that he was "manic depressive." He admitted he had depression in the past to the point where he did not want to get out of bed. D.P. also acknowledged that he needed psychiatric treatment and was therefore willing to continue to see a psychiatrist and take his medications on an outpatient basis. He also wanted to continue treatment for his medical issues, including his metastatic prostate cancer.

According to D.P., if released from the conservatorship, he would coordinate with a social worker to find housing. Before he was hospitalized, he lived on the streets; he was not homeless, he was "a street person." He received $800 per month in social security benefits and knew where to obtain food and clothing.

On cross examination, D.P. clarified that he did not believe he had a mental illness; he had "a psychosis . . . ." But his psychosis was "temporary" and could be treated with medication. If he were released from the conservatorship, he would obtain his medication "from some doctor somewhere. Either a pharmacy, the [Department of Veterans Affairs] or a clinic, wherever." He believed he needed to be treated by a doctor and take medication and promised to "follow up" if released.

In terms of housing, D.P. explained that he would "work with the [Department of Veterans Affairs], get some type of housing or a room, or whatever." He believed his $800 monthly social security benefit would be "sufficient on the streets."

## C.    *Verdict and Order Reappointing Conservator*

Following testimony and argument, the jury returned a verdict finding that D.P. was "presently gravely disabled due to a mental disorder." Based on the verdict, the trial court granted the County's petition and issued an order reappointing the County as the conservator of the person and estate of D.P. for one year, ending on April 24, 2019.

On July 10, 2018, D.P. timely filed a notice of appeal.

## III.  DISCUSSION

### A.    *The LPS Act: An Overview*

"The LPS Act governs the involuntary detention, evaluation, and treatment of persons who, as a result of mental disorder, are dangerous or gravely disabled. (§ 5150 et seq.) The Act authorizes the superior court to appoint a conservator of the person for one who is determined to be gravely disabled (§ 5350 et seq.), so that he or she may receive individualized treatment, supervision, and placement (§ 5350.1). As defined by the Act, a person is 'gravely disabled' if, as a result of a mental disorder, the person 'is unable to provide for his or her basic personal needs for food, clothing, or shelter.' (§ 5008, subd. (h)(1)(A).) [¶] . . . [¶] The procedures for establishing a conservatorship include a

7

number of requirements pertaining to notice, hearing and trial rights, and other matters. Specifically, the petition for appointment of a conservator of the person and the citation for conservatorship must be served upon the proposed conservatee at least 15 days before the scheduled hearing date, and the proposed conservatee must be given notice of the privileges and rights subject to deprivation as part of the conservatorship. (§ 5350; Prob. Code, §§ 1823, 1824.) A hearing must be held within 30 days of the date of the petition, and the court must 'appoint the public defender or other attorney for the . . . proposed conservatee within five days after the date of the petition.' (§ 5365.) The proposed conservatee 'shall have the right to demand a court or jury trial on the issue whether he or she is gravely disabled,' but must do so before or within five days following the hearing on the conservatorship petition. (§ 5350, subd. (d).)" (*Conservatorship of John L.* (2010) 48 Cal.4th 131, 142–143 (*John L.*).) "Court or jury trial shall commence within 10 days of the date of the demand." (§ 5350, subd. (d)(2).)

"The party seeking imposition of the conservatorship must prove the proposed conservatee's grave disability beyond a reasonable doubt, and a jury verdict finding such disability must be unanimous. (*Conservatorship of Roulet* (1979) 23 Cal.3d 219, 235 [152 Cal.Rptr. 425, 590 P.2d 1].) An LPS conservatorship automatically terminates after one year, and reappointment of the conservator must be sought by petition. (§ 5361.)" (*John L., supra*, 48 Cal.4th at p. 143.)

8

B.	*Failure to Commence Jury Trial Within Statutory Time Limit*

	1.	Background

	As noted above, the original one-year LPS conservatorship order was due to terminate on April 24, 2018, and the initial hearing on the County's petition for reappointment of conservator was set for April 3, 2018.  On that date, D.P.'s counsel appeared, requested a continuance, and waived the 30-day time period in section 5365 within which the initial hearing must be held.  Based on D.P.'s request, the trial court continued the initial hearing to April 16, 2018.

	On April 16, 2018, D.P.'s counsel appeared and, before commencement of the initial hearing on the petition, demanded a jury trial.[4]  Counsel also requested a date for jury trial "as soon as possible . . . ."  The trial court continued the matter to May 3, 2018, for a jury trial setting, without any objection by D.P.'s counsel based on the 10-day limit in section 5350, subdivision (d)(2).

	On May 3, 2018, D.P.'s counsel appeared and informed the trial court that D.P. was asking for a "jury panel as soon as possible."  When the court set the matter for jury trial on June 11, 2018, D.P.'s counsel responded, "Object to just a long continuance, but I understand."  The court replied that "[a]ll objections as to time are reserved."  D.P.'s counsel then informed the court that he had a scheduling conflict on June 13, 2018, at

_____

[4]	Under section 5350, subdivision (d)(1), D.P.'s demand for jury trial waived his right to an initial hearing by the trial court on the petition.

9

which point the court set June 11 as the jury trial readiness conference and June 14 as the date for jury trial.

On June 11, 2018, the trial court informed the parties that jury trial would need to be continued for one week, from June 14 to June 21. When D.P.'s counsel informed the court that he had a conflict on June 21, the court suggested June 28. In response, D.P.'s counsel asked for a date of July 5, and the court agreed, scheduling a jury trial readiness conference for July 3 and trial for July 5.

On July 3, 2018, the parties appeared and, due to a scheduling conflict, agreed to commence jury trial on July 6, 2018. As noted, D.P.'s jury trial commenced on July 6, 2018, 81 days following his April 16, 2018, demand for jury trial.

2. Statutory Right to Commence Jury Trial Within 10 Days

It is undisputed that D.P. exercised his statutory right to demand a jury trial and that his trial did not commence within the 10-day statutory time limit. On appeal, he contends that the trial court's failure to commence the jury trial within the statutory time limit: (1) deprived the court of the jurisdiction to conduct the subsequent jury trial; and (2) violated his federal and state due process rights.

3. Jurisdiction to Conduct Jury Trial

In support of his jurisdictional contention, D.P. cites *Conservatorship of Kevin M.* (1996) 49 Cal.App.4th 79 (*Kevin M.*)

and argues that the 10-day time limit for commencing a jury trial in section 5350, subdivision (d)(2) is "mandatory," not "'directory,'" and therefore the court lacked jurisdiction over his trial.  But, as D.P. acknowledges, *Kevin M.* involved the *failure of a proposed conservatee* to demand a jury trial within the five-day time limit in section 5350, subdivision (d)(1); and, although the court in *Kevin M.* concluded that the five-day period was mandatory and a "conservatee loses the right to jury (or court) trial if the demand is not timely made," it expressly held that the trial court was not divested of jurisdiction to conduct the jury trial in that case.  (*Kevin M., supra*, 49 Cal.App.4th at p. 89.)

D.P. also acknowledges the holding in *Conservatorship of James M.* (1994) 30 Cal.App.4th 293 (*James M.*) that the failure to comply with the 10-day time limit did not deprive the trial court of jurisdiction to hold a jury trial.  But he nevertheless maintains that the holding in that case is somehow inapplicable to the facts at bar.  We disagree.

In *James M., supra*, 30 Cal.App.4th 293, the conservatee contended that the trial court lacked jurisdiction to reappoint the conservator because the prior conservatorship had expired and his trial did not commence within the 10-day period in section 5350, subdivision (d)(2) following his demand for a court trial. The court held that the 10-day time limit in section 5350 is "directory," not mandatory, and thus the court had inherent jurisdiction to conduct the reappointment hearing.  (*James M., supra*, 30 Cal.App.4th at p. 295.)  In reaching this conclusion, the court in *James M.* reasoned as follows:  "'With respect to time-limit statutes the general rule is that "requirements relating to the time within which an act must be done are directory rather than mandatory or jurisdictional, unless a contrary intent is

11

clearly expressed.'" [Citations.] . . . [¶] Section 5350, subdivision (d) does not provide a consequence or penalty for failure to commence the trial within 10 days of the demand. [Citations.] This omission suggests the statute is intended to be directory only." (*Id.* at p. 298.)

We agree with the holding in *James M., supra*, 30 Cal.App.4th 293 that the 10-day time limit to commence court or jury trial in section 5350, subdivision (d)(2) is directory because that section does not specify a consequence or penalty for failure to comply with the 10-day time limit. Thus, the commencement of D.P.'s jury trial well after the expiration of that time limit had no effect on the trial court's fundamental jurisdiction to conduct the jury trial.[5]

### 4. Due Process Violation

D.P. next contends that even if the trial court had jurisdiction to conduct the jury trial in this case, the 71-day delay in bringing the case to trial following the expiration of the 10-day statutory time limit violated his due process rights and the conservatorship therefore must be reversed.

It is well established that involuntary commitment to a mental institution is subject to the due process protections of the Fourteenth Amendment. "[C]ivil commitment for any purpose constitutes a significant deprivation of liberty that requires due

---

[5] D.P. did not pursue mandamus relief once the statutory 10-day period expired. We therefore express no opinion on whether or what relief might be appropriate when a proposed conservatee seeks a writ of mandamus to enforce the statutory jury trial deadline.

process protection. [Citations.]" (*Addington v. Texas* (1979) 441 U.S. 418, 425.) Specifically, "LPS Act commitment proceedings are subject to the due process clause because significant liberty interests are at stake. ([]*John L., supra*, 48 Cal.4th at p. 150.) But an LPS Act proceeding is civil. (*Conservatorship of George H.* (2008) 169 Cal.App.4th 157, 162 . . . .) '[T]he stated purposes of the LPS Act foreclose any argument that an LPS commitment is equivalent to criminal punishment in its design or purpose.' ([]*John L.*[, *supra*, 48 Cal.4th] at p. 151.) Thus, not all safeguards required in criminal proceedings are required in LPS Act proceedings. ([*Ibid.*] . . . .)" (*Conservatorship of P.D.* (2018) 21 Cal.App.5th 1163, 1167.)

"'Once it is determined that due process applies, the question remains what process is due.' *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). Though the required procedures may vary according to the interests at stake in a particular context, *Boddie v. Connecticut*, 401 U.S. 371, 378 (1971), 'the fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner."' [Citations.]" (*Brock v. Roadway Express, Inc*. (1987) 481 U.S. 252, 261.)

"In conservatorship cases, we balance three factors to determine whether a particular procedure or absence of a procedure violates due process: the private interests at stake, the state or public interests, and the risk that the procedure or its absence will lead to erroneous decisions. ([*Conservatorship of*] *Ben C.* [(2007)] 40 Cal.4th [529,] 538–539 [relying on *Lassiter v. Department of Social Services* (1981) 452 U.S. 18 . . . and *In re Sade C.* (1996) 13 Cal.4th 952 . . .].) We also consider "'the availability of prompt remedial measures.'" (*Thorn* [*v. Superior*

*Court* (1970)] 1 Cal.3d [666,] 673.)"  (*John L., supra*, 48 Cal.4th at p. 150.)

Although D.P. asserts that his federal and state due process rights were violated by the delay in the commencement of his jury trial, he makes no attempt to articulate how he was prejudiced by the delay.  Nor does our independent review of the record demonstrate any prejudice.  There is no indication that memories faded or that witnesses or evidence became unavailable during the delay.  Moreover, although the trial court did not commence trial until July 6, 2018, following the jury verdict, the court set the resulting conservatorship to expire on April 24, 2019, that is, one year after the prior conservatorship was set to expire.  Thus, D.P. was not subject to any additional time under his conservatorship as a result of the delay in commencing trial.

Based on these particular facts, even assuming for purposes of argument that the delay in commencing trial violated D.P.'s due process rights, we conclude that any error was harmless beyond a reasonable doubt.  (See, e.g., *People v. Hurtado* (2002) 28 Cal.4th 1179, 1194 ["the *Chapman* test (*Chapman v. California*[ (1967)] 386 U.S. 18) []that federal constitutional error is reversible unless shown to be harmless beyond a reasonable doubt . . . is used for the review of federal constitutional error in civil commitment cases in California generally"]; *Conservatorship of Early* (1983) 35 Cal.3d 244, 255 [finding instructional error was not harmless beyond a reasonable doubt].)

14

C. *Instructional Error: Modified CACI No. 4000*

D.P. contends that the trial court erred when it failed to instruct the jury with the third element of the CACI No. 4000 definition of "gravely disabled," i.e., to prove a proposed conservatee is gravely disabled, it must be shown "[t]hat [the conservatee] is unwilling or unable voluntarily to accept meaningful treatment." According to D.P., the omission of that element reduced the County's burden of proof to "less than beyond a reasonable doubt."

1. <u>Background</u>

Prior to commencement of trial, D.P.'s counsel objected to the County's modified version of CACI No. 4000, which read: "The [County] claims that [D.P.] is gravely disabled due to a mental disorder and therefore should be placed in a conservatorship. In a conservatorship, a conservator is appointed to oversee, under the direction of the court, the care of persons who are gravely disabled due to a mental disorder. To succeed on this claim, the [County] must prove beyond a reasonable doubt all of the following: [¶] 1. That [D.P.] has a mental disorder; and [¶] 2. That [D.P.] is gravely disabled as a result of the mental disorder." The unmodified CACI No. 4000 included a third element in brackets that read: "[3. That [*name of respondent*] is unwilling or unable voluntarily to accept meaningful treatment.]" D.P.'s counsel argued that the modified instruction improperly omitted the third element. Counsel also noted, however, that a slightly modified version of that element had been added to the County's proposed version of CACI No. 4002. Specifically, the

15

last line of the County's proposed version of CACI No. 4002 was modified to include: "In determining whether [D.P.] is presently gravely disabled, you may consider whether he is able or willing voluntarily to accept meaningful treatment." After a colloquy with counsel, the trial court ruled that it would give the County's proposed CACI Nos. 4000 and 4002 as modified.

####     2.     Standard of Review/Legal Principles

We review claimed errors in the accuracy or completeness of the jury instructions under the de novo standard of review. (*Conservatorship of P.D.* (2018) 21 Cal.App.5th 1163, 1167.) "In considering the accuracy or completeness of a jury instruction, we evaluate it in the context of all of the court's instructions." (*Caldera v. Department of Corrections & Rehabilitation* (2018) 25 Cal.App.5th 31, 44–45.)

D.P. cites *Conservatorship of Davis* (1981) 124 Cal.App.3d 313 (*Davis*) and *Conservatorship of Walker* (1987) 196 Cal.App.3d 1082 (*Walker*) in support of his position that the trial court erred in failing to include CACI No. 4000's third element, which, as noted, requires an additional finding that a proposed conservatee "is unwilling or unable voluntarily to accept meaningful treatment" before a proposed conservatee is considered gravely disabled. The County disagrees and contends the trial court was not required to instruct the jury on the third element, citing *Conservatorship of Symington* (1989) 209 Cal.App.3d 1464, 1467 (*Symington*), in support.[6]

---

[6]     The Directions for Use for CACI No. 4000 note that there is a split of authority as to whether a jury must be instructed on the third element. The recent decision in *Conservatorship of K.P.*

16

3.    *Davis*

In *Davis, supra*, 124 Cal.App.3d 313, the trial court in an
LPS Act conservatorship proceeding initiated by the County gave
the following instruction to the jury:  "'You are instructed that
before you may consider whether [the proposed conservatee] is
gravely disabled you must first find that she is, as a result of a
mental disorder, unwilling or unable to accept treatment for that
mental disorder on a voluntary basis.  If you find that [the
proposed conservatee] is capable of understanding her need for
treatment for any mental disorder she may have and capable of
making a meaningful commitment to a plan of treatment of that
disorder she is entitled to a verdict of "not gravely disabled."'"
(*Id.* at p. 319.)  At trial, the jury found the proposed conservatee
not gravely disabled.  (*Id.* at p. 317.)  The County appealed,
arguing that the trial court erred in delivering the instruction.
(*Id.* at p. 320.)  The Court of Appeal disagreed, finding no
prejudicial error.  (*Id.* at pp. 329, 331.)

In reaching that conclusion, the court attempted to
harmonize the purpose of the LPS Act, which includes
safeguarding individual rights, with section 5008, subdivision
(h)(1), which defines the term "gravely disabled."  (*Davis, supra*,
124 Cal.App.3d 313, 322.)  The court noted that section 5352
additionally "provides that a petition to establish a
conservatorship shall be filed only after a preliminary
determination has been made that the person is gravely disabled
as a result of mental disorder *and* is unwilling, or incapable of

(2019) 39 Cal.App.5th 254 notes this split in authority and
follows the reasoning of *Symington, supra*, 209 Cal.App.3d 1464,
which reasoning, as explained below, we also find persuasive.

17

accepting, treatment voluntarily." (*Davis, supra*, 124 Cal.App.3d at p. 322.)  Given the LPS Act's purpose, the court concluded that "a person sought to be made an LPS conservatee subject to involuntary confinement in a mental institution, is entitled to have a unanimous jury determination of all of the questions involved in the imposition of such a conservatorship . . . ." (*Id.* at p. 329.)

4.      *Walker*

In *Walker, supra*, 196 Cal.App.3d 1082, the trial court, using the language of the section 5008, subdivision (h)(1) definition, instructed the jury that the term "gravely disabled" means "'a condition in which a person, as a result of a mental disorder, is unable to provide for his or her basic personal needs for food, clothing or shelter.'" (*Walker, supra*, 196 Cal.App.3d at p. 1091.)  But the trial court further instructed:  "'If you find that [the proposed conservatee] can survive safely in freedom by himself or with the help of [an] available, willing and responsible family member, friend or other third party and that [the proposed conservatee] is willing and capable of accepting voluntary treatment, then you must find that [the proposed conservatee] is not gravely disabled.'" (*Ibid.*, italics omitted.)  The jury found the proposed conservatee to be gravely disabled.  (*Id.* at p. 1088.)

The court in *Walker, supra*, 196 Cal.App.3d 1082, held the latter instruction was erroneous because it advised the jury that a conservatorship was inappropriate only if the proposed conservatee "can provide for his needs *and* is willing to accept treatment." (*Id.* at p. 1092.)  In reaching this conclusion, the court interpreted the holding in *Davis, supra*, 124 Cal.App.3d 313

18

as follows:  "The jury should determine if the person voluntarily accepts meaningful treatment, in which case no conservatorship is necessary.  If the jury finds the person will not accept treatment, then it must determine if the person can meet his basic needs on his own or with help, in which case a conservatorship is not justified."  (*Walker, supra*, 196 Cal.App.3d at pp. 1092–1093.)

5.     <u>*Symington*</u>

In *Symington, supra*, 209 Cal.App.3d 1464, the trial court found the proposed conservatee to be gravely disabled and further concluded that "it was not necessary to determine additionally whether the conservatee was unwilling or unable to accept treatment on her own . . . ."  (*Id.* at p. 1466.)  On appeal, the conservatee argued, "'Grave disability, *by definition*, includes an unwillingness and/or inability on the part of the proposed conservatee to voluntarily accept treatment for the mental disorder making the conservatee unable to provide for the necessities of life.'"  (*Id.* at p. 1467.)  The court disagreed.  (*Ibid*.)

In rejecting the additional requirement for a gravely disabled determination, the court in *Symington, supra*, 209 Cal.App.3d 1464, noted that "gravely disabled" as defined in section 5008, subdivision (h)(1) was "'[a] condition in which a person, as a result of a mental disorder, is unable to provide for his basic personal needs for food, clothing, or shelter[.]'"  (*Symington, supra*, 209 Cal.App.3d at p. 1468.)  It also noted that the statutory definition of gravely disabled made no mention of a proposed conservatee's refusal or inability to consent to treatment and that language concerning whether a proposed

19

conservatee was unable or unwilling to accept treatment appeared only in section 5352. (*Symington, supra*, 209 Cal.App.3d at pp. 1467–1468.) The court reasoned that section 5352 was enacted to allow treatment facilities to initiate conservatorship proceedings at the time of admission if a patient is uncooperative. (*Symington, supra*, 209 Cal.App.3d at p. 1467.) According to the court, that section was not enacted "as an additional element to be proved to establish the conservatorship itself." (*Ibid.*) As the court observed, "many gravely disabled individuals are simply beyond treatment." (*Ibid.*) The court also explained that the language of section 5352 is "not intended to be a legal term, but is a standard by which mental health professionals determine whether a conservatorship is necessary in order that a gravely disabled individual may receive appropriate treatment. A person who, as a result of a mental disorder, is unable to care for her food, clothing, and shelter needs is more likely than not unable to appreciate the need for mental health treatment. If a mental health professional determines this to be so, the person may appropriately be recommended for a conservatorship. Put another way, mental health facilities may initiate conservatorship proceedings before they accept a gravely disabled patient. But the terms are simply not interchangeable, and an individual who will not voluntarily accept mental health treatment is not for that reason alone gravely disabled." (*Symington, supra*, 209 Cal.App.3d at p. 1468.) In so concluding, the court disagreed with the implicit holding of *Walker, supra*, 196 Cal.App.3d at pages 1092–1093.[7] It also

---

[7] We have expressed skepticism of the rationale in *Walker, supra*, 196 Cal.App.3d 1082. (*Conservatorship of George H.* (2008) 169 Cal.App.4th 157, 162, fn. 3.)

distinguished the facts and the jury instructions at issue in *Davis, supra*, 124 Cal.App.3d 313, noting that "the issue resolved in [*Davis*] did not call for an analysis of the propriety of the instruction. And none was offered." (*Symington, supra*, 209 Cal.App.3d at p. 1469.)

### 6. *Symington* is persuasive

We agree with the reasoning of *Symington, supra*, 209 Cal.App.3d 1464. (See also *Conservatorship of K.P., supra*, 39 Cal.App.5th at pp. 267–268.) In reaching this conclusion, we begin our analysis with the well-established principle that ""[i]nstructions in the language of an applicable *statute* are properly given."" (*Metcalf v. County of San Joaquin* (2008) 42 Cal.4th 1121, 1131, quoting *Conservatorship of Gregory* (2000) 80 Cal.App.4th 514, 520; 7 Witkin Cal. Procedure (5th ed. 2008) Trial, § 268, p. 321.)

Here, the applicable statute is section 5350, subdivision (b)(1), which provides that a conservator may be appointed "for a person who is gravely disabled as defined in subparagraph (A) of paragraph (1) of subdivision (h) of section 5008." As noted, section 5008, subdivision (h)(1) defines "gravely disabled" as "[a] condition in which a person, as a result of a mental health disorder, is unable to provide for his or her basic personal needs for food, clothing, or shelter." Thus, an instruction based on the express language of this definition, as given by the trial court here, is presumptively correct.

Our conclusion concerning the instruction on the definition of gravely disabled is further informed by section 5350, which provides an exception to the definition of "gravely disabled." It

21

states that a person is not "'gravely disabled' if that person can survive safely without involuntary detention with the help of responsible family, friends, or others who are both willing and able to help provide for the person's basic personal needs for food, clothing, or shelter." (§ 5350, subd. (e)(1).) But section 5350 provides no similar exception for persons who are able or willing to accept treatment, an omission that strongly suggests the Legislature did not consider an inability or unwillingness to voluntarily accept treatment as an essential element of the gravely disabled definition.

Moreover, section 5008, subdivision (h)(1)(A) makes no cross-reference to other provisions of the LPS Act that do refer to being unable or unwilling to accept treatment. (See, e.g., §§ 5250, subd. (c); 5252; 5350.5; 5352.) Because the role of the court when construing a statute is not to insert what has been omitted (Code Civ. Proc., § 1858; *California Cannabis Coalition v. City of Upland* (2017) 3 Cal.5th 924, 939), we cannot expand upon the section 5008, subdivision (h)(1) definition of "gravely disabled."

As D.P. notes, section 5352 "provides that a petition to establish a conservatorship shall be filed only after a preliminary determination has been made that the person is gravely disabled as a result of mental disorder *and* is unwilling, or incapable of accepting, treatment voluntarily." But, as the court in *Symington, supra*, 209 Cal.App.3d 1464, explained, section 5352 allows "treatment facilities to initiate conservatorship proceedings at the time a patient is accepted where the individual may prove uncooperative," but does not add an element for proving a person is gravely disabled. (*Symington, supra*, 209 Cal.App.3d at p. 1467; see also *Conservatorship of K.P., supra*, 39 Cal.App.5th at p. 268.) Further, here, D.P. was

22

subject to a reappointment petition pursuant to section 5361, which requires the state "to prove beyond a reasonable doubt that the conservatee *remains* gravely disabled." (*Conservatorship of Deidre B.* (2010) 180 Cal.App.4th 1306, 1312, italics added.) Thus, section 5352 and the third element of CACI No. 4000 would not apply in this context.

The trial court therefore did not err in instructing the jury with modified CACI No. 4000 because D.P.'s unwillingness or inability to accept voluntarily meaningful treatment was not a required element under section 5008, subdivision (h)(1). We note, however, that here the trial court also instructed the jury that it was permitted to consider D.P.'s willingness to accept treatment as one factor in deciding whether D.P. was gravely disabled by delivering its modification to CACI No. 4002 described above.

D.    *Sufficiency of Evidence:  Grave Disability*

D.P. contends that the evidence was insufficient to support the jury's finding that he was gravely disabled as a result of a mental disorder. According to D.P., the trial court should have granted his motion for a directed verdict because Dr. Mulokas's testimony did not support a finding that he was unable to provide for his basic needs for food, clothing, and shelter. D.P. maintains that the expert's testimony instead showed at best only that, if released, D.P. would not continue to take his psychiatric medications and would fail to follow up on needed medical treatment.

### 1. Standard of Review

In reviewing D.P.'s claim, "we apply the substantial evidence standard to determine whether the record supports a finding of grave disability. The testimony of one witness may be sufficient to support such a finding. (*Conservatorship of Johnson* (1991) 235 Cal.App.3d 693, 697 [1 Cal.Rptr.2d 46].) We review the record as a whole in the light most favorable to the trial court judgment to determine whether it discloses substantial evidence. Substantial evidence, which is evidence that is reasonable, credible, and of solid value, also includes circumstantial evidence. (*Conservatorship of Walker* (1989) 206 Cal.App.3d 1572, 1577 [254 Cal.Rptr. 552].)" (*Conservatorship of Carol K.* (2010) 188 Cal.App.4th 123, 134.)

### 2. Analysis

The County's reappointment petition was supported by the expert testimony of D.P.'s treating psychiatrist, Dr. Mulokas, which, by itself, was sufficient to support the jury's gravely disabled finding. It is well established that an expert opinion is substantial evidence if it is supported by facts and a reasoned explanation of how those facts inform the opinion. (*San Diego Gas & Electric Co. v. Schmidt* (2014) 228 Cal.App.4th 1280, 1292, citing *Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117.)

Dr. Mulokas testified that, in her opinion, D.P. was gravely disabled and was unable to voluntarily accept treatment. She based her opinion on her training and experience, her months-long treatment of D.P., her interviews with his treatment team,

and his medical records.  Although she premised her opinion concerning the gravely disabled finding on her stated belief that D.P. would decompensate if released—because he lacked insight into his mental disorder—that testimony supported a reasonable inference that D.P. would not continue to voluntarily take necessary medication or seek needed psychiatric and medical treatment.  And, Dr. Mulokas testified that without such necessary medication and treatment, D.P. would become symptomatic once again and, as a result, be unable to provide for his basic needs on his own.

Although D.P. provided testimony that, at times, conflicted with Dr. Mulokas's conclusions, under the governing standard of review discussed above, we must assume the jury resolved such evidentiary conflicts in favor of its grave disability finding. Similarly, in examining the trial record, we must draw all reasonable inferences from the expert's testimony in support of the jury's finding.  Under this standard, this was not a close case. We therefore conclude substantial evidence supported the jury's verdict that D.P. was gravely disabled as the result of a mental disorder beyond a reasonable doubt.

## IV.  DISPOSITION

The trial court's order reappointing the County as the conservator of the person and estate of D.P. is affirmed.  No costs are awarded on appeal.

KIM, J.

We concur:

BAKER, Acting P. J.

MOOR, J.